In the Matter of the Estate of JOHN WHALEN, Deceased.

Surrogate's Court, New York County, December 29, 1932.

*Blandy, Mooney & Shipman* [*Edmund L. Mooney, Wilber W. Chambers* and *Thomas F. Morris* of counsel], for Nellie M. Mahaney.

*Wood, Malloy & France,* for John Whalen and others.

*Ray H. Shoemaker,* for Johanna Whalen McIllvaigh and others.

*Livingston & Livingston,* for Bridget Creagh and others.

*Frederick E. Klein,* special guardian, for Mary Fitzgerald and others.

*James O. Trybom,* for Kate Creagh.

*James H. Hickey* and *Daniel J. McGrath,* for Mary Holton.

*Paul Orszag,* for Patrick Creagh and John Creagh.

*Gillespie & O'Connor,* for His Eminence Patrick Cardinal Hayes.

*Jonathan Holden,* for Mary R. Hart.

*Beals & Nicholson,* for John D. Beals, Jr., and others.

O'BRIEN, S.   John Whalen died December 31, 1926, at his home, 456 West One Hundred and Fifty-fifth street, New York.   His last will and testament gives two general legacies of $100,000 each, followed by a gift of one-half of his residuary estate.   No disposition is made of the remaining one-half of the residuary estate and thus the testator died intestate as to this one-half.   The testator was a bachelor and the last survivor of four children.   His father and mother predeceased him and his sisters and brother died unmarried and without issue.   The testator's nearest relatives are first cousins

and the descendants of first cousins. The identity of certain first cousins and their descendants has been conclusively established and they are recognized as heirs at law and next of kin. Numerous other persons have come forward claiming relationship to the testator, and the refusal of the executrix to recognize their claims as valid necessitated a long and exhaustive inquiry into the Whalen family history going back as far as the beginning of the last century. John Whalen was born in this city about the year 1851, the son of Denis Whalen and Ellen O'Brien. Denis Whalen was one of that great band of rugged Irishmen who, finding conditions intolerable at home due to the great crop failures of the period and the burdensome taxes, emigrated to this country about the middle of the last century. He married Ellen O'Brien and settled here in the city. From his humble beginning as the son of an Irish immigrant John Whalen advanced rapidly in his chosen profession of the law. He at one time read law in the office of the great Charles O'Connor. He became a man of prominence in his profession and also in public life, having served as the corporation counsel of the city of New York. Due to the prominence of the decedent, his death and the fact that he died intestate as to half his residuary estate, received a great deal of publicity in this country and in Ireland. Inquiries poured into this court from all corners of the world asking information and assistance in proving relationship to the decedent.

A proceeding to probate the decedent's will was instituted by the executors named therein shortly after his death. The known heirs at law and next of kin were named in the petition and served with a citation. In February, 1927, this court made a decree admitting the will to probate and directing the issuance of letters testamentary to the executors. In June, 1927, persons claiming to be heirs at law and next of kin began to come forward and attempt to establish their relationship. The executors thereupon instituted a proceeding to confirm the probate of the will, citing all the heirs at law and next of kin of the testator known and unknown. Upon the return of the citation certain claimants filed objections to the confirmation of the probate of the will. Thereafter the executors procured an order requiring the claimants to show cause why their status as heirs at law and next of kin should not be determined before any hearing was had on the objections to the confirmation of the probate of the will. The hearings upon the status of the claimants as heirs at law and next of kin were then begun. On the application of the attorney for a group of claimants an open commission was issued to Thomas F. O'Brien, Esq., to take testimony and documentary proof in the Irish Free State on all matters

relating to the history of the ancestors of the decedent, John Whalen. The attorney for the executors and attorneys for the various claimants and the special guardian representing infant and unknown parties took part in the hearings before the commissioner held at Clonmel, Tipperary, in the Irish Free State. Over five hundred pages of testimony were taken before the commissioner during the examination of many witnesses and the introduction of numerous exhibits. The thoroughness with which the attorneys for the respective parties pursued their inquiry in the proceedings before the commissioner was rewarded by the many important points established during the proceeding. The commission continued until all possible sources of information had been exhausted. The parties then returned and the hearings before the surrogate were resumed October 1, 1928. On October 15, 1928, the objections to the probate of the will were withdrawn by stipulation and a decree admitting the will to probate was entered. The decree also provided that the testimony theretofore taken should be perpetuated and further provided a means of taking further testimony should the occasion arise. The testimony of various parties was taken pursuant to stipulation during 1928 and 1929. On August 5, 1930, the surviving executrix filed her intermediate account of proceedings and a petition for its judicial settlement. On the return of the citation objections were filed to the account by various parties on the ground that the account as filed did not recognize as valid their claims to share in the estate as heirs at law and next of kin. The hearings were then continued and a record of over fifteen hundred pages was compiled. The intervention of a new group of claimants necessitated the issuance of a commission to Arkansas where additional testimony was taken. The parties now before the court claiming to be heirs at law and next of kin are: (1) Mary Whalen Holton, who claims to be a descendant of Patrick Whalen, an alleged brother of Denis, father of the testator; (2) John J. Whalen and others, likewise claiming to be descendants of Patrick Whalen, alleged brother of Denis; (3) Owen Aherne and others, claiming to be descendants of James Whalen, alleged brother of Denis; (4) Michael Kearney and others, claiming to be descendants of Michael Whalen, alleged brother of Denis; and (5) Johanna Whalen McIlvaigh and others, claiming to be descendants of John Whalen, alleged brother of Denis, testator's father.

The Patrick Whalen through whom Mary Whalen Holton claims is a separate and distinct personality from the Patrick through whom John J. Whalen and others claim. Still another Patrick is produced by the executrix and thus three separate and distinct Patrick Whalens are before the court and the identity of one of

them as the brother of Denis is of vital importance in this controversy.

In this case, as in all cases involving pedigree and the distribution of intestate property, it is first necessary to establish the identity of the common ancestor and from that point to construct the true family tree, to which all claimants must attach themselves to be successful. *As all the claimants attempt to establish relationship to the decedent through the paternal side of the family*, the inquiry here was limited to that branch of the family. It is interesting to note, and of importance to an understanding of this proceeding, that " Whalen," " Phelan " and " Whelan " are all variable spellings of the same name and are used interchangeably. From the voluminous record compiled in this lengthy proceeding and from the host of exhibits introduced, bit by bit, the ancestry of John Whalen is put together. None of the claimants here seriously disputes the relationship of those listed by the executrix in the account as admitted relatives, and none of the claimants asserts a closer degree of relationship to those admitted relatives. It would, therefore, seem best to first consider the family tree constructed by the executrix, which has been conclusively established by competent evidence to be correct, in so far as it establishes the identity of the admitted relatives. Thus, the proofs submitted by the various claimants in attempting to attach themselves to this family tree, which they allege is incomplete, may be better understood. *It has now been conclusively established that the common ancestor was Patrick Whalen, who married Johanna Kelly and who lived near Ballyporeen in the townland of Moher, County Tipperary, Ireland.* It was at first supposed that the common ancestor's first name was John. Anna McDonald, an admitted first cousin of the decedent, made an affidavit which was attached to the petition for the confirmation of the probate of the will, stating that her grandfather's name was John Whalen. This mistake, apparently an honest one, was later corrected and satisfactorily explained by Miss McDonald who testified to declarations of her mother that the common ancestor's name was Patrick. All the early claimants constructed family trees listing John Whalen as the common ancestor. All but one group now agree that Patrick Whalen is the correct name of the common ancestor. Miss Pyne, an admitted relative, testified to numerous declarations by members of the family that Patrick was the common ancestor. All the testimony taken in Ireland substantiates this, as do the exhibits submitted. A transcript of the records of the Roman Catholic church at Mitchellstown, County Cork, Ireland, was introduced in evidence setting forth the marriage of Patrick Whalen to Johanna Kelly, February 20, 1803. The baptismal

certificates of Patrick, Margaret and Mary Phelan, children of Patrick Phelan and Johanna Kelly, were also introduced in evidence.

A transcript of the records of the Emigrant Industrial Savings Bank shows that Denis Whalen and his wife opened a joint account there is 1857 and that the parents of Denis were Patrick Whalen and Johanna Kelly. Because of the fact that the name, Patrick Whalen, is not uncommon in Ireland, the establishment of the residence of the common ancestor was of equal importance to the identification of the name. For a better understanding of the proof submitted to establish the common ancestor's residence in Ballyporeen, townland of Moher, County Tipperary, a rough outline of the geography of that section of the country is of assistance. Ballyporeen is situated in the southwest corner of the County Tipperary near the adjoining counties of Limerick, Cork and Waterford. The nearest large town to Ballyporeen is Mitchellstown, in County Cork, which lies to the west. The nearest town is Clogheen, a short distance east of Ballyporeen. To the north is Tipperary town and to the northeast are the large towns of Caher and Clonmel. Originally the parish in which the Whalens lived was known as Templetenny. This parish church was destroyed early in the nineteenth century and the parish was united with the parish of Shanrahan with a church at Clogheen. Later a church was built at Ballyporeen.

*From this sketchy outline of the geography and parochial history of Ballyporeen and its environs, the evidence submitted, both oral and documentary, is better understood and becomes conclusive in linking the common ancestor and his descendants with the locality in and around Ballyporeen. First,* there is the marriage certificate of Patrick Whalen and Johanna Kelly in Mitchellstown on February 20, 1803, and then the baptismal certificates of *three children of this marriage, Patrick, Margaret and Mary.* Patrick's baptismal certificate shows that he was baptized in St. Mary's Church, Clogheen, in 1810. Margaret was baptized in the same church in 1816 and Mary's certificate shows she was baptized in the Church of the Assumption, Ballyporeen, in 1819. Thus, these records coincide with the history of the various parishes outlined above. There were introduced in evidence at the hearings before the commissioner in Ireland all available records of the old Kingston estate which included the territory in and around Ballyporeen and the townland of Moher. *These rent rolls and maps considered in connection with declarations of those of admitted blood relationship show that Patrick Whalen, the common ancestor, was a tenant of a small plot in the townland of Moher, at least from 1832 to 1851.* There can be no doubt as to the admissibility of these records as ancient documents.

Their antiquity is apparent and they certainly came from the proper custody. (*Matter of Webster* v. *Purcell*, 106 App. Div. 360; affd., 186 N. Y. 549.)

This location of the common ancestor on a small plot of land in the townland of Moher is another important point. To succeed now all claimants must trace their ancestry to a Patrick Whalen of Ballyporeen and to a Patrick Whalen who married a Johanna Kelly and occupied this particular plot of ground in the townland of Moher. After thus establishing the identity and residence of the common ancestor with great particularity, the proof then goes forward to trace his descendants down to the present day. *The declarations of the admitted members of the family were to the effect that Patrick, the common ancestor, never came to this country but died in Ireland.* This contention is substantiated by an official record known as the " General Valuation of Rateable Property in Ireland, County of Tipperary, Barony of Iffa and Offa West." *This record, dated August 5, 1852, shows Johanna Whalen as the tenant of the plot in the townland of Moher on which Patrick Whalen had been located.* From this an inference is drawn that Patrick Whalen was dead at the time the record was made. *This inference is further supported by the rent roll of the Kingston estate for the year 1858.* This record shows " Widow O'Brien " as the tenant of the plot formerly occupied by Patrick Whalen. There is a marginal notation on this rent roll opposite the former holding of Patrick Whalen which has been deciphered as " Gone to America, And dead." From the testimony of the land agent of the Kingston estate this notation may be safely construed as meaning that Patrick Whalen was dead and his widow had gone to America. These records confirm the declarations of the members of the family that Patrick Whalen died in Ireland and never came to this country.

Of this marriage of Patrick Whalen and Johanna Kelly there were born six children, according to the family tree as constructed by the executrix. The baptismal certificates of Patrick, Margaret and Mary, children of this marriage, have already been referred to. It has been conclusively established by the declarations of those of the admitted blood that there were three other children of this marriage; namely, *Denis, Maurice and John.* The record is replete with proof that these three were children of this marriage and as the fact is not seriously disputed that these six, namely, *Patrick, John, Denis, Maurice, Mary and Margaret,* were children of the marriage, it seems unnecessary to set forth at length the mass of conclusive evidence on this point. It is more advantageous to refer to various portions of this evidence in considering the proof submitted by the various claimants in their effort to connect themselves with

these children. At that point the importance of dates, names and events is more readily discernible.

After establishing the identity of the common ancestor and the six children of his marriage with Johanna Kelly, the next step in the construction of the family tree was the tracing of the family to this country. Considering each child as the head of a separate branch of the family, by following each line down to the present time the heirs at law and next of kin of the testator will be determined.

*Denis Whalen,* son of Patrick and Johanna and father of the decedent, *is alleged to have come to this country in 1845,* arriving in the port of Boston. There appears to be no record of his entry into the country but this might be explained by the fact that a fire in the State House in Boston destroyed a number of old records. A transcript of the records of the *Emigrant Industrial Savings Bank shows that Denis Whalen and his wife Ellen opened a joint account there in 1857.* This record shows that Denis Whalen was from Clogheen in the County Tipperary and arrived in this country in 1845 on the ship *Alban Galway* sailing from Cork to Boston. His father is stated to be Patrick Whalen and his mother Johanna Kelly. This record also discloses that *Denis was married and that his wife's name was Ellen from Benduff, County Cork, who came to this country about 1837 on the ship Chile from Liverpool.* The declarations of the sisters of Denis as testified to by their living descendants were to the effect that *Denis married Ellen O'Brien in Savannah, Ga., in 1850.* According to the declarations the time of the marriage is fixed by the fact that shortly after his marriage Denis and his wife went to hear Jennie Lind sing at Castle Garden and this was in 1850. A piece of paper in the handwriting of a brother of the testator (the late Patrick H. Whalen, a member of the bar), which was written many years ago, was introduced in evidence which reads as follows: *" Sept. 1850, Jennie Lind at Castle Garden. Ma was two months married."*

According to the pedigree declarations and what amounts to a family legend Ellen O'Brien went to Savannah as a nursemaid, and it was there that Denis Whalen met and married her. Additional proof that Ellen O'Brien was in Savannah is found in a letter written by her son Patrick Whalen, a brother of the testator, in which he speaks of his mother telling him of the departure of the *" Jasper Greens " from Savannah for the Mexican War in 1845, when she was a young girl.* This connection of both parents of the testator with Savannah is of great importance and will be referred to later in considering the proofs submitted to establish the identity of a Patrick Whalen as a son of the common ancestor. Denis and his wife lived in New York in 1850 in the Cherry Hill section. He

worked on the estate of Charles O'Connor, the greatest lawyer of
his day. Mr. O'Connor later took the decedent into his office,
having met him when he was a young boy accompanying his father
to work. Denis moved from Cherry Hill to Fort Washington about
1853 and purchased a small parcel of property on One Hundred and
Seventy-fifth street, near the house of his sister, Mary Whalen
McDonald. The record of the deed to Denis Whalen was intro-
duced in evidence and this property was owned by the decedent
at the time of his death. Denis Whalen had four children, John,
Ellen, Annie and Patrick. Their baptismal certificates were intro-
duced in evidence. Denis died on April 16, 1864. This fact is
established by the record of his death in the bureau of health and
by a slip of paper in the handwriting of the testator which states
that Denis died April 16, 1864. None of the children of Denis
ever married and all predeceased John. The death of John, the
testator, thus ended this line.

The history of Margaret Whalen, daughter of the common
ancestor, is important in its relation to the proof submitted by
the various claimants and in the fact that many of her declarations
were used to construct the family tree. All her descendants are
admitted relatives. *She was baptized in Ballyporeen in 1816* accord-
ing to the certificate of baptism which was introduced in evidence.
According to her own declarations as testified to by her descendants
she married Thomas Clancy in 1836 and six children were born of
this marriage. Three of these children died in infancy. *In 1854
Margaret and her three children and her mother, Johanna Kelly
Whalen, left Ireland on the ship Washington.* The story of this
eventful and harrowing voyage is vividly told in the pedigree decla-
rations of those of the admitted blood. The *Washington* was
shipwrecked and the Whalens were rescued and brought to this
country on the ship *Westchester.* On this ship they were placed
in with the cattle and as a result of the shipwreck and exposure,
Johanna Kelly Whalen and a child of Margaret Whalen Clancy
died and were buried at sea. One pathetic incident of the voyage
is described with great particularity. When the little child, Mary
Clancy, fell sick, her mother gave a sailor a sovereign to get some
fresh water. The man took the sovereign but never returned with
the water. The story of this voyage was well known among all
the admitted relatives and it is significant that none of the claimants
appeared to have any knowledge of this eventful voyage. This
graphic and vivid story of the voyage is certainly something that
once heard is impressed on the mind and would be handed down
in a family from generation to generation. Upon her arrival in
this country Margaret lived near her brother Denis, and sister Mary

on One Hundred and Seventy-fifth street. She later moved down to Mott street with her two children, Margaret and Hannah. *A record of the Emigrant Bank shows her living at 63 Mott street in 1859.* Her daughter Hannah Clancy never married; she lived with decedent as his housekeeper until she died in 1925. Her other daughter, Margaret, married a Mr. Pyne. Four children were born of this marriage, three of whom are still living, two having testified in this proceeding. All the admitted relatives on the paternal side are descendants of either Margaret Whalen Clancy or her sister, Mary Whalen McDonald.

The history of Mary Whalen McDonald, like that of her sister, Mrs. Clancy, is important in that at various points it bears on the proof of various claimants in support of their claim and also in that two of her children are still living and are the only surviving admitted first cousins of the decedent. According to the baptismal certificate introduced in evidence, *Mary Whalen was baptized in Bally- poreen, June 12, 1819.* A marriage certificate showing her marriage to Bartholomew McDonnell on *January 26, 1845,* was also introduced in evidence. (McDonnell appears to be one of the varieties of spelling of the name McDonald or O'Donnell in this family.) Two children of this marriage were born in Ireland, John in 1845 and Patrick in 1847. This child, John B. McDonald, later gained great prominence as the pioneer builder of the subway system in this city. *In 1849 the McDonalds came to this country on the ship Canton.* After settling here, six more children of this marriage were born, Margaret and Anna, who are still living, Maurice, Bartholomew, William and Bartholomew. The first child named Bartholomew died and a child born later was given the same name. The McDonald family lived near the other Whalens on One Hundred and Seventy-fifth street. Mary Whalen's husband, Bartholomew, Sr., died in 1888 and Mary died in 1893. *The descendants of Mary Whalen McDonald who survived the decedent are Margaret McDonald Cunningham and Anna McDonald, daughters of Mary Whalen and first cousins of the decedent, Georgie McDonald Reed, a daughter of John B. McDonald, son of Mary, and the following children of Mary's son William; Walter R. McDonald, Grace McDonald, Agnes McDonald Frances and Mary McDonald Rundle. It is the contention of the executrix that those above named and Mary, Margaret and Thomas Pyne, grandchildren of Margaret Whalen Clancy, are the only heirs at law and next of kin on the paternal side who survived the testator.* The executrix asserts that the remaining three children of the common ancestor, Patrick, John and Maurice, died leaving no issue.

Little or nothing is known of the history of Maurice Whalen,

except that he predeceased Margaret Whalen Clancy, a fact disclosed by the list of her deceased relatives which she compiled every year just prior to All Souls Day for the purpose of having masses and prayers for the repose of their souls in accordance with the practice of her religion. No person appearing herein claims to be related to the decedent through Maurice. In passing, it may be noted that the admitted relatives who testified gave little or no information concerning Maurice, a brother of testator's father Denis. Likewise as to the history of John Whalen, a son of the common ancestor, the executrix supplies little in the way of affirmative proof. All the evidence submitted on her behalf in regard to John was to disprove the authenticity of a John Whalen through whom a group of claimants seek to establish relationship to the decedent. This evidence is discussed *infra* in connection with the evidence offered to support the claim of relationship through John.

*Three distinct Patrick Whalens, each alleged to be the son of the common ancestor and a brother of Denis, testator's father, have been brought forward in this proceeding.* The executrix produces one Patrick and two groups of claimants each produce a Patrick through whom they claim. The existence and identity of a Patrick, an uncle of testator, is established first by his baptismal certificate which was introduced in evidence. This certificate shows that *Patrick Whalen,* ·son of Patrick Whalen and Johanna Kelly, *was baptized August 5, 1810.* The existence of a Patrick is also established by the declarations of the admitted members of the Whalen family. Of the Patrick brought forward by the executrix, little is known from his birth until from the evidence he is located in Savannah, Ga., about 1840. The first inkling as to the whereabouts of this Patrick came from the testimony of Mrs. Cunningham, a first cousin of the decedent. There had been testimony adduced to the effect that Maurice Whalen had gone to Savannah and that Denis, testator's father, had gone there to look for him. Whether Maurice actually went to Savannah or not has not been proven, but certainly Mrs. Cunningham's testimony goes a long way towards establishing the identity of the true Patrick as the one who died in Savannah. She testified that her mother (Mary Whalen McDonald) told her that Patrick had gone to Savannah and had married there. According to her mother's story Patrick died about a year after his marriage and his wife wrote a letter to one of the Whalens in New York telling them of his death. Upon being pressed for the maiden name of Patrick's wife, Mrs. Cunningham stated that it was either Burchell or Churchill. The documentary evidence introduced on behalf of the executrix completely supports the testimony of Mrs. Cunningham. First there is the certificate of marriage show-

ing the marriage of Patrick Whalen and Eleanor Burchell on April 17, 1842, by the Rev. Gregory Duggan. This certificate is from the records of the Cathedral of St. John the Baptist in Savannah. An old tombstone was discovered in the Colonial Cemetery in Savannah. A photograph of this tombstone which bears the following inscriptions was introduced in evidence:

" I. H. S.
TO
The memory of
PATRICK PHELAN
A native of Ballyporeen
County of Tipperary
Ireland
who died October 10, 1842
aged 24 years
Erected by his beloved
and affectionate widow
Ellen Phelan "

Incidentally it should be recorded that she married again. The superintendent of the park and tree commission of Savannah identified the photograph and testified that he had charge of the Colonial Cemetery for thirty-two years and that the tombstone had been in the cemetery to his own knowledge for twenty years. There was also introduced in evidence a certificate of the clerk of the council of the city of Savannah, who has control of the record of all burials in the Colonial Cemetery and this record shows that Patrick Phelan was buried there October 11, 1842. A certified copy of the petition of Ellen Phelan for letters of administration on the estate of Patrick Phelan who died October 10, 1842, was also introduced in evidence. This documentary evidence conclusively proves that Patrick Phelan, a native of Ballyporeen, husband of Ellen Phelan, died in Savannah, Ga., October 10, 1842. Taken in connection with the testimony of Mrs. Cunningham that her uncle Patrick went to Savannah, married and died there, the identification of this Patrick as the son of the common ancestor and the brother of the testator's father is almost complete. Upon this point the testimony that Denis Whalen went to Savannah in search of his brother is also important. Denis met and married his wife in Savannah. There seems to be a definite link between Savannah and the Whalen family. With the production of this Patrick the family tree of the executrix is complete. Thus, according to the executrix, the common ancestor was Patrick Whalen who married Johanna Kelly. Of this marriage six children were born, Denis

(testator's father), Patrick (who died in Savannah), John, Maurice, Margaret and Mary. The only living descendants of the common ancestor are alleged to be descendants of the two girls, Margaret Whalen Clancy and Mary Whalen McDonald. Of the claimants who claim relationship, two groups claim through Patrick, one group through John, one group through James, an alleged son of the common ancestor, and one group through Michael, also alleged to be a son of the common ancestor.

In determining the status of the various claimants those claiming relationship through Patrick Whalen, son of the common ancestor, will be considered first.

Mary Whalen Holton is the daughter of a Patrick Whalen who she alleges was the uncle of the decedent and the son of the common ancestor. She thus claims to be a first cousin of the testator, John Whalen. To prove her relationship this claimant relies on the declarations of her father made to her and to her friend, Margaret Keane, and upon the entries in a prayer book owned by her father. The substance of these declarations as testified to by the claimant and Margaret Keane is that her father, Patrick Whalen, was born in Ballyporeen; that his father's name was John, who married Johanna Scully or Kelly; that her father had brothers, Denis, John, James and Michael and sisters, Margaret and Mary.· *Of the history of her father's brothers and sisters, the claimant knew little or nothing.* Her father's declarations to her were to the effect that Denis had died in America, John had stayed in Ireland, Mary had married a Bartholomew McDonnell and that the rest were scattered about. She testified that to her knowledge her father never wrote or received a letter from any of his relatives, and that she had never heard of Moher. This claimant was born in Borris-in-Ossory in 1846, the daughter of Patrick Whelan and Anne Carroll of Rathdowney who are alleged to have been married in 1843. According to the proof submitted, Patrick Whelan was evicted from his home in Borris-in-Ossory in 1850 and emigrated in 1851. The claimant testified that she came to America in 1851, landed in Boston, and went to stay with her mother's relatives in Temple street, Worcester, Mass. Her father also came to Worcester but returned to Ireland where he died in 1875. Her mother remained in Worcester where she died. The claimant remained in Worcester for six or seven years and then returned to Ireland and stayed with her father in Dublin. She later returned to Worcester alone, returning again to Ireland and was present at her father's death.

This meagre family tree constructed by the claimant relies mainly for its support on the entries of her father in his prayer book. This prayer book was published by John Murphy & Co. of Baltimore in

1856. On a fly leaf in the front of the book is the following entry: "Patrick Whelan, Temple Street, Worcester, Mass., June, 1858." The three unprinted pages in the back of the book contain the following entries: "Patrick Whelan born Ballyporeen 1808 married Anne Carroll 1843 born Rathdowney 1820. Mary born Borris-in-Ossory 1846, Margaret born and died two months old 1848 two daughters of the marriage." On the opposite page is the entry which is the main support of the whole claim. It reads: "Denis, my brother, died in America 1864." There is an entry on the next page which provides as follows: "Patrick Whelan evicted Borris-in-Ossory September 1850. Emigrated to America 1851. Returned to Dublin June 1861 owing to bad health wife Anne; (Mary daughter) who wished to visit her sister."

The declarations of the claimant's father and his entries in the prayer book is the only evidence in support of this claim which is of the slightest probative value. All this evidence, which is of course hearsay, in the form of pedigree declarations was admitted over the objection of all the interested parties, subject to its being connected up later on. In seeking a guide for the rule on the admissibility of hearsay in the form of pedigree declarations, we need look no further than the leading case of *Aalholm* v. *People* (211 N. Y. 406). In that case Judge WERNER has collected and analyzed the authorities and restated and clarified the rule. This rule is that the admissibility of pedigree declarations although hearsay is subject to three conditions: 1. The declarant must be dead. 2. The declarations must have been made *ante litem motam*, that is, before any controversy arose and there was no motive to distort the truth. 3. The declarant must be related by blood or affinity to the family concerning which he speaks, and moreover his relationship by blood or affinity to this family must be established by evidence of other than his own declarations.

These rules seem to me to apply to all pedigree declarations regardless of the form in which they are presented, whether as ancient documents, entries in a family bible, inscriptions on tombstones, etc. The form of the pedigree declaration may affect its weight but should not affect its admissibility. None of the authorities cited by the claimant refute this statement. The case of *Fulkerson* v. *Holmes* (117 U. S. 389) does not support the proposition that a pedigree declaration contained in an ancient document is admissible *per se*. In that case the pedigree declaration was contained in a deed over sixty years old. The court in admitting the deed in evidence stated that it was an ancient document and, therefore, no proof of its due execution was necessary, but the court then went on to point out the evidence, other than the declaration in

the deed, which connected the declarant with the family in question. Thus the third rule in *Aalholm* v. *People* (*supra*) was complied with and this rule was held to apply to pedigree declaration in the form of ancient documents. To the same effect is the case of *Young* v. *Shulenberg* (165 N. Y. 385), also cited by the claimants. Corpus Juris (Vol. 22, § 1165, p. 946) states: " The fact that an instrument is an ancient document does not, however, affect its admissibility in evidence further than to dispense with proof of its genuineness where it is otherwise inadmissible." It is also stated in this volume of Corpus Juris (p. 251) that " An oral declaration regarding pedigree is competent, to the same extent as written evidence on the same point, even though the latter is contained in a family Bible." A similar statement is found in Chamberlayne's Modern Law of Evidence (Vol. 4, § 2950 *et seq.*). Thus the rule governing the admissibility of pedigree declarations appears to be the same no matter in what form the declarations are presented.

Every scrap of this claimant's proof which is of any probative value is in the form of pedigree declarations made by her father either to herself and her friend, Margaret Keane, or contained in the prayer book. To render this evidence admissible there must be some evidence, outside of the declarations themselves, that the declarant was a member of the family whose pedigree is in issue here. (*Aalholm* v. *People, supra*.) The only possible link between the declarant and the ancestors of the decedent, John Whalen, is similarity of name and religion. While the cases cited (*Fulkerson* v. *Holmes*, 117 U. S. 389; *Young* v. *Shulenberg*, 165 N. Y. 385; *Eisenlord* v. *Clum*, 126 id. 552, 562; *Layton* v. *Kraft*, 111 App. Div. 842) state but slight evidence, connecting the declarant with the family of whom he speaks, is sufficient, *Aalholm* v. *People* (211 N. Y. 406, 419) expressly holds that identity of names, religion and nativity are too common to be alone sufficient. The soundness of this rule is apparent here. The fact that an Irishman's name is Whalen and that he is a Catholic does not seem to be any evidence that he is related to any one of the hundreds of other Whalens who are all Catholics. The identity of names, nativity and religion means less in Ireland than in any other country. People of the same name are usually found in or around the same section of the country and practically all are Catholics. In a certain sense these people are related as being members of what is termed the same " clan." But the mere identity of name, nativity and religion is no proof by itself of relationship as we consider it here. For example, there were at least ten different Whalen families discovered in and around Ballyporeen.

There being no evidence *dehors* the oral and written pedigree

declarations which connects the declarant to the family of the decedent, all these declarations are inadmissible. (*Aalholm* v. *People, supra.*)

Passing from the admissibility to the weight of the evidence, it is apparent that even if admissible the evidence is not of sufficient probative value to substantiate the claim of relationship to the decedent. The family tree constructed by this claimant is incomplete and partly erroneous. According to the proof submitted in support of this claim, the common ancestor was *John Whalen who married Johanna Scully or Kelly.* It has now been established that the common ancestor's name was Patrick, not John. The declarations of the claimant's father, alleged brother of Denis Whalen, testator's father, were to the effect that he had brothers named Denis, John, James and Michael and sisters Mary and Margaret. *No mention is made of Maurice Whalen, who was a brother of Denis. The inclusion of James and Michael as brothers of Denis is a sharp variance with the family tree constructed by the executrix.* It has never been established that the common ancestor had sons named James and Michael; in fact the evidence rather negatives any such contention. The claimant's only evidence of what became of her father's brothers and sisters is that Mary Whalen married Bartholomew McDonnell and that Denis Whalen died in America in 1864. The claimant knew nothing else about her father's brothers and sisters or their descendants and nothing of the death of the common ancestor and his wife. *She testified that to her knowledge, her father never wrote or received a letter from any of his brothers and sisters.* The entry in the prayer book, " Denis my brother died in America 1864," is foundation on which this claim is laid. The weight of this evidence is seriously affected by the fact that neither the claimant's father nor his informant had any personal knowledge of the death of Denis. The claimant testified that her father heard of the death of Denis from a man named Gorman who worked on the Great Southern Railway. How the claimant's father identified the Denis who died as his brother is not apparent. This claim is further weakened by the evidence submitted by the executrix in establishing the identity of a Patrick Whalen, son of the common ancestor and brother of Denis, in Savannah, Ga. As has been stated above, there are three distinct Patrick Whalens produced here, all alleged to be the son of the common ancestor and the brother of Denis Whalen, testator's father. I am satisfied that this claimant has failed to establish the identity of her father as the true Patrick by a fair preponderance of the evidence. Accordingly her objections to the account are overruled and her claim is dismissed.

John J. Whalen and others also claim to be related to the decedent through a Patrick Whalen, alleged brother of Denis, testator's father. This group is composed of eleven grandchildren and one great grandchild of a Patrick Whalen who died in Brockton, Mass., in 1885. These claimants first proceed to establish their identity as descendants of this Patrick Whalen and then proceed to attempt to identity their ancestor Patrick as a son of the common ancestor. *There is no doubt that these claimants are the descendants of a Patrick Whalen who died in Brockton, Mass.* The proof on this point is conclusive. It is in their attempt to identify this Patrick as the son of the common ancestor and a brother of Denis Whalen, that these claimants encounter difficulty.

In support of their contention that their ancestor, Patrick Whalen, was a son of the common ancestor, these claimants rely mainly on his declarations and the declarations of his wife. There was introduced in evidence the baptismal certificate of Patrick Whalen, son of Patrick Whalen and Johanna Kelly. The baptism took place in St. Mary's Church, Clotheen, in 1810. These claimants contend that this is the birth certificate of their ancestor. To prove this they attempt to show that he was seventy-five years old when he died in 1885. This would establish the date of his birth as 1810 and thus coincide with the baptismal certificate. Patrick Whalen, a claimant herein and a grandchild of the Patrick through whom these people claim, testified that he understood that his grandfather was seventy-five years old when he died. He stated he has learned this from his mother and his folks and that he did not know it of his own knowledge. This witness' brother, John Whalen, testified that his grandfather was between seventy-three and seventy-five years old when he died. Michael Kent, another grandchild of this Patrick, testified that he had always understood that his grandfather was seventy-five years old when he died. One of the most remarkable witnesses in this whole proceeding was Patrick Drislane who testified on behalf of these claimants. This man, a native of Ballyporeen, was ninety-four years old when he testified and knew the grandfather of these claimants very well. According to his testimony, this Patrick Whalen, or as he is known in the record, " Bridgewater " Patrick, was about seventy or seventy-five years old when he died.

All the declarations of " Bridgewater " Patrick, as testified to by the claimants, and Patrick Drislane were to the effect that he was born in Ballyporeen and married Margaret Hickey in Ballyporeen. It has been conclusively established that " Bridgewater " Patrick was a native of Ballyporeen. In addition to his declarations and those of his wife to that effect, there was introduced in evidence

a marriage certificate of the Roman Catholic church of Ballyporeen which shows that on May 9, 1838, Patrick Phelan married Margaret Hickey. There were also introduced in evidence five baptismal certificates of children of this marriage in Ballyporeen. These claimants have thus established that their ancestor was born in Ballyporeen *about* the year 1810.

John J. Whalen, claimant herein, a grandson of " Bridgewater " Patrick, attempted to establish the identity of his great grandmother as Johanna Kelly from the declarations of a Thomas Kelly to that effect. This Thomas Kelly was not related to any one involved in this proceeding or to Johanna Kelly as far as is known. It seems that his declarations are inadmissible and of no weight.

To prove the connection of these claimants to the admitted relatives, the declarations of John Whalen, a son of " Bridgewater " Patrick, to the effect that he had a cousin in New York who was a big politician and lawyer, were testified to.

Up to this point the evidence outlined above tends to establish the validity of this claim to relationship but in attempting to make their family tree coincide with that of the admitted relatives, these claimants weaken rather than strengthen their status. In the first place, these claimants and the witnesses called on their behalf, have repeatedly testified that the name of their great grandfather was John Whalen. As has already been pointed out, the father of Denis Whalen was named Patrick. Thus, if the father of a " Bridgewater " Patrick was named John and Denis' father was named Patrick, it is evident that Denis and " Bridgewater " Patrick cannot be brothers. What is most fatal to this claim is that these claimants cannot separate themselves from those claiming under James and Michael Whalen no matter how hard they try. The status of those claiming under James and Michael is discussed *infra*, but it is appropriate to say here that these people have failed to establish their status as heirs at law and next of kin of the decedent and have not proven that James and Michael were sons of the common ancestor, Patrick Whalen. That portion of the record which embodies the evidence offered in support of those claiming through " Bridgewater " Patrick is replete with references to " Shaun Leagh," which is Gaelic for " Gray John." " Bridgewater " Patrick is alleged to have declared that he was the son of " Shaun Leagh." In the testimony taken before the commissioner in Ireland with respect to the claims of those who are alleged to be related through James and Michael Whalen, there is further reference to " Shaun Leagh " as the father of James and Michael. This reference to " Shaun Leagh " by people in different parts of

the world seems to link James and Michael Whalen to "Bridgewater" Patrick. It was testified on behalf of those claiming under James and Michael that Patrick, brother of James and Michael Whalen, married Margaret Hickey. As "Bridgewater" Patrick married Margaret Hickey his identity as a brother of James and Michael is almost complete. The testimony of Mrs. Margaret Murray definitely connects "Bridgewater" Patrick with James Whalen. Mrs. Murray is a niece of Margaret Hickey, the wife of "Bridgewater" Patrick. She testified that the Patrick Whalen who married her aunt was a brother of James Whalen.

Considering all the evidence submitted on behalf of these claimants, whether admissible or inadmissible, it seems apparent that these people have not established by a fair preponderance of the evidence that their ancestor, "Bridgewater" Patrick, was a son of the common ancestor. The objections to the account filed on behalf of these claimants are, therefore, overruled and their claims are dismissed.

Michael Kearney and others and Owen Aherne and others claim to be related to the decedent through a James and a Michael Whalen, alleged to be brothers of Denis Whalen, testator's father. As James and Michael Whalen were admittedly brothers, the claims of all persons claiming through them may be discussed together. As has been hereinbefore stated, all these claimants have failed to establish their status as heirs at law and next of kin of the decedent. Most of the evidence in support of these claims centers about James Whalen, alleged brother of Denis, testator's father. Michael Kearney testified to the strange story of James Whalen. James is supposed to have killed a man with a stone on his wedding night. As the story goes, he and his bride were returning from the wedding when they were waylaid by a group of men who tried to kidnap his bride; jokingly or seriously it does not appear. James picked up a stone and hurled it, striking a man on the head. The man later died and James was convicted of manslaughter and transported to the penal colony in New South Wales. After seven years he returned to Ireland and settled near Ballyporeen. According to the testimony, the father of James and Michael Whalen was John, or "Shaun Leagh." As has been already pointed out, the common ancestor's name was Patrick. All the evidence of these claimants in support of their contention that James and Michael were sons of the common ancestor is in the form of pedigree declarations. There is no evidence outside of the declarations themselves, other than the similarity of name, religicn and nativity, connecting the declarants with the family of the decedent, John Whalen. Even if all these declarations are admissible these claimants must

still fail. The declarations of those of the admitted blood to the effect that the common ancestor did not have sons named James and Michael overcomes the proof offered in support of this claim. It seems to me that these claimants and those claiming through " Bridgewater " Patrick have shown that they are the descendants of another family of Whalens. The common ancestor of this family would be " Shaun Leagh," or Gray John, who had sons Patrick (" Bridgewater " Patrick), John, James and Michael.

I hold, therefore, that these claimants have failed to prove their claim of relationship to the decedent and accordingly the objections to the account filed on their behalf are overruled and their claims are dismissed.

Johanna Whalen McIllvaigh and others claim to be related to the decedent through John Whalen, alleged brother of Denis Whalen, testator's father. This group of claimants is composed of an alleged first cousin of the decedent, and the wife and children of another alleged first cousin who survived the decedent.

*These claimants first proceed to build up their own family tree.* That is, prescinding from the identity of their ancestor John Whalen as a brother of Denis, testator's father, they first seek to establish that they are the descendants of *a John Whalen* who married Johanna Fennell. *The documentary and oral evidence offered to prove this point seem conclusive and there seems to be no doubt that these claimants are the descendants of a John Whalen who married Johanna Fennell.* First there is the marriage certificate which was introduced in evidence which shows the marriage of John Phelan and Johanna Fennell in Ballyporeen on March 3, 1840. The baptismal certificates from the parish of Ballyporeen establish the birth of the following children of this marriage: *Margaret in 1840, Mary in 1843, Johanna in 1845, Patrick in 1847, and Bridget in 1849.*

The history and identity of each of these children has been traced with great particularity right down to the present day.

*Margaret* of the baptismal certificate of 1840 has been positively identified as Margaret (Maggie) Spicer, who died in Chicago May 26, 1912, by an overwhelming mass of documentary and oral evidence. She acquired the name Spicer not through marriage but by long association with a family named Spicer for whom she worked as a domestic.

*Similarly the Mary of the baptismal certificate of 1843 has been identified as having died in the west unmarried and without issue.* The declarations of the proven members of *this family* are to the effect that she went west as a servant with a family named Henshaw. Maggie Spicer, her sister, received a letter telling of Mary's death.

*Much of the testimony concerning the history of the children of Johanna Fennell Whalen* was within the personal knowledge of the witnesses and cannot seriously be disputed.

*The Johanna of the birth certificate of 1845 has been identified as Johanna Whalen McIllvaigh, the claimant herein.* She came to this country in 1854 with her uncle John Fennell, according to her own testimony which is substantiated by the manifest of the ship *Emerald Isle* which was introduced in evidence. *The manifest shows that "Judy" Whalen, as the claimant was known, came to this country on the ship Emerald Isle in 1854.* Her own testimony, which is corroborated by the oral and the documentary evidence, describes her subsequent movements after landing in this country. She went with the rest of her family to Ottawa, Ill. She subsequently married John A. McIllvaigh at Memphis, Tenn., on November 6, 1872. She then moved to Arkansas and at the time of the death of the decedent she and her husband were living at Forth Smith, Ark.

*The Patrick of the baptismal certificate of 1847 is identified* as the Patrick Whalen who died in Slaton, Tex., February 22, 1927. According to his own declarations and those of members of *his* family, he came to this country in 1854 with his uncle, John Fennell. The manifest of the ship *Emerald Isle*, heretofore referred to, contains a record of his entry into this country. Patrick then went out to Ottawa, Ill., with his mother and sisters. He learned the blacksmith's trade in the mid-west and thereafter worked at various places in the south and west. On June 5, 1887, he married Mary Hughes at Waco, Tex. Of this marriage four children were born, three of whom are still living. These four children were Edgar B. Whalen, who died at his grandmother's home in Ottawa, Ill., on September 2, 1890; Margaret Whalen Goodwin, who is still living at Amarillo, Tex.; Nellie Whalen Beal, now living at Slaton, Tex., and Charles Whalen, who also lives in Slaton, Tex.

According to the testimony of her sister, Johanna Whalen McIllvaigh, the child, Bridget, who was baptized in 1849 in Ballyporeen, died as a very young girl.

The identity of the children, whose brief history is outlined above, as the children of a *John Whalen* who married Johanna Fennell, is so positively established that there is no need to refer further to the mass of conclusive evidence on this point.

The identity of Johanna Fennell Whalen Lowe, mother of these children, as the Johanna Fennell who married a *John Whalen* in Ballyporeen on March 3, 1840, is also conclusively established. That she was Johanna Fennell is established by the declarations of members of the Fennell family as testified to by Theresa Norris, daughter of Margaret Fennell of Ballyporeen. This witness'

mother lived in Ottawa, Ill., knew Johanna Fennell Whalen Lowe, said she was her sister, and that she had married a John Whalen in Ballyporeen. The claimant Johanna Whalen McIllvaigh testified as to the Fennell connection and as to her mother's declarations that she married a John Whalen in Ballyporeen. According to the testimony of Johanna Whalen McIllvaigh, her mother came to this country with her daughter Margaret shortly after hearing of the death of her husband, John Whalen. She remained in New York until the arrival of her three other children in 1854. Shortly thereafter she married a man named Robert Lowe in New York. This second marriage raises a presumption, which is unrebutted, that Johanna Fennell Whalen was a widow when she married the second time. Shortly after her marriage she and her children went to Ottawa, Ill., where many of the Fennells had settled. Johanna Fennell Whalen Lowe died in Ottawa, Ill., in December, 1900. The above is a summary of the claimants' own family tree. Thus far they have established that they are the descendants of a John Whalen who married Johanna Fennell in Ballyporeen in 1840 and that Johanna Fennell Whalen was a widow when she emigrated to this country.

*The claimants' proof then directs itself towards establishing that the John Whalen who married Johanna Fennell was the son of the common ancestor, Patrick Whalen, and the brother of Denis Whalen, testator's father.* Most of the claimants' evidence in support of this contention is in the form of pedigree declarations. The substance of these declarations, which emanate principally from Johanna Fennell, wife of John Whalen, is that John Whalen who married Johanna Fennell lived in the *townland of Moher*, just outside of Ballyporeen; that his father was Patrick Whalen who married Johanna Kelly; that this John Whalen had brothers Denis, Patrick and Maurice and sisters Mary and Margaret; that his sister Mary married Bartholomew O'Donnell and that Margaret married Thomas Clancy; that this John Whalen after his marriage continued to live in Moher with his parents; that five children were born of his marriage to Johanna Fennell; that this John Whalen emigrated to America leaving his wife and children in Ireland; that his wife, Johanna Fennell, received a letter informing her of his death in Coldwater, Mich.; that Johanna Fennell Whalen subsequently emigrated to America with her daughter Margaret; that her child Bridget died as an infant in Ireland; that her other three children followed her to America accompanied by her brother John Fennell; that Johanna Fennell Whalen married a second time in New York; that her second husband's name was Lowe; that she then proceeded out to Ottawa, Ill., with her children; that she died there in 1900.

The documentary evidence submitted on behalf of these claimants enhances the probative value of these pedigree declarations, the substance of which is set forth above. The documentary evidence unearthed in Ireland and offered in evidence by these claimants is particularly illuminating. A definite link between the Whalens of Moher and the Fennells is shown by these records. The names and dates in these records dovetail with the oral declarations.

*First, there is the marriage certificate of John Phelan and Johanna Fennell in the parish of Ballyporeen on March 3, 1840. The witnesses to this marriage, according to the certificate, were Thomas Fennell and Mary Phelan.* Johanna Fennell had a brother Thomas who died in Ottawa, Ill., in 1854. The claimants seek to identify the witness Mary Phelan as the daughter of the common ancestor and the sister of the testator's father, Denis Whalen. In support of this contention the claimants refer to the testimony of Anna McDonald, the daughter of Mary Whalen, and an admitted first cousin of the decedent. Miss McDonald stated that her mother had spoken of a Fennell girl as a friend of hers and that she (Miss McDonald) thought the girl's name was Johanna. In addition to the marriage certificate, the baptismal certificates of three of the children of John Phelan and Johanna Fennell were introduced in evidence. These certificates show:

(1) That Margaret, child of John Phelan and Johanna Fennell, was baptized in Ballyporeen on *December 19, 1840; that her parents lived in Moher* and that the child's godparents were *Denis Phelan and Honora Fennell.*

(2) That Mary, child of John Phelan and Johanna Fennell, was baptized in Ballyporeen on February 27, 1843; that her parents lived in *Moher* and that her godparents were *John O'Donnell and Mary Phelan.*

(3) That Johanna, child of John Phelan and Johanna Fennell, was baptized in Ballyporeen on *April 27, 1845,* and that her godparents were *Bartholomew O'Donnell and Mary Ryan.*

The claimants particularly stress the date of the latter baptism and the fact that Bartholomew O'Donnell was the child's godfather. They assert that this Bartholomew O'Donnell is the man who married Mary Whalen, sister of the testator's father, Denis. In support of this contention the claimants refer to the significant fact that Mary Whalen and Bartholomew O'Donnell were married *January 26, 1845,* and that one of the witnesses to the marriage was *John Fennell.* This evidence certainly tends to show a definite link between the ancestors of these claimants and the family of the decedent, John Whalen.

Most of the evidence on which these claimants rely is, of course, in the form of pedigree declarations either oral or written.

All this evidence was admitted, subject to being connected later on, over the objection and exception of the executrix. The basis of the objection was, of course, that the evidence was hearsay and not within the pedigree exception to the hearsay rule of exclusion. More particularly stated, the executrix contends that there is no evidence outside of the pedigree declarations themselves which connects the declarants with the family of the decedent. This is the third subdivision of the rule as stated in *Aalholm* v. *People* (*supra*).

To render admissible the pedigree declarations offered in support of their claim to relationship, these claimants rely on the following evidence, which is independent of the pedigree declarations:

1. The testimony of Mary Pyne, an admitted relative, as to the declarations of her mother, a first cousin of the decedent, to the effect that she (Margaret Clancy Pyne) had cousins in Ottawa, Ill., and that she had written to them a few times, but had lost track of them. Miss Pyne then stated that at the time the declarations were made, she understood that the cousins spoken about were on the Whalen side. The importance of this evidence cannot be overestimated. The testimony was given on October 10, 1928, and up until that time this group of claimants referred to in the record as the " Ottawa claimants," had never been heard of. Their present attorney, who up until that time represented the descendants of James Whalen, " the stone thrower," and Michael Whalen, commenced an investigation in Ottawa, Ill., and as a result this whole group of claimants was unearthed. The disclosures seem to be more than a coincidence. Considering the testimony of Miss Pyne in connection with the conclusive, admissible proof that these claimants are the descendants of *a John Whalen of Moher* who married Johanna Fennell together with the *fact that the executrix has not produced one scrap of affirmative evidence as to the history and identity of the John Whalen who was the son of the common ancestor*, the conclusion seems inevitable that these claimants are the descendants of John Whalen, son of the common ancestor and brother of Denis Whalen, testator's father. This testimony, which is independent of the pedigree declarations offered by the claimants, seems to me to furnish that *slight* proof *dehors* the declarations which is referred to in *Aalholm* v. *People* (*supra*). That only *slight* proof is necessary of the relationship of the declarant to the family of which he speaks is stated in practically all the cases involving the admissibility of pedigree declarations (*Aalholm* v. *People, supra; Washington* v. *Bank for Savings*, 171 N. Y. 166; *Young* v. *Shulenberg*, 165 id. 385; *Eisenlord* v. *Clum*, 126 id. 552).

2. In addition to the testimony above referred to and the fact that the executrix has offered no affirmative proof as to the history and identity of John Whalen, there is the additional circumstance of identity of name, religion and nativity of the ancestors of the claimants with those of the decedent John Whalen. While this fact would not of itself render the declarations admissible, in connection with other evidence *dehors* the declarations, it has probative value.

3. Finally, there is that definite link, running through the record between the Whalens of Moher and the Fennells.

I hold, therefore, that the pedigree declarations offered by these claimants in support of their claim to relationship are admissible. These declarations being admissible, the proof of the relationship of these claimants to the decedent is overwhelmingly conclusive. Briefly, these claimants have established that they are the descendants of John Whalen who married Johanna Fennell; that this John Whalen was the son of Patrick Whalen and Johanna Kelly; that this John Whalen lived in the townland of Moher and had brothers Denis, Patrick and Maurice and sisters Margaret and Mary. The proof is complete and relationship is established. In combating the proof of these claimants the executrix refers to minor discrepancies in the claimants' proof, but such slight errors seem to me to be continually cropping up in the tracing of ancestry. Indeed, the family tree of the admitted relatives contains similar minor errors.

Considering all the proof offered in support of this claim I hold that the status of Johanna Whalen McIllvaigh and Patrick Whalen (now deceased) as first cousins of the decedent who survived him has been established. The objections to the account filed on their behalf and on behalf of the widow and children of Patrick Whalen are sustained.

I hold, therefore, that the heirs at law and next of kin of the decedent on the paternal side of his family who survived him are the following persons: Margaret McDonald Cunningham, Anna McDonald, Johanna Whalen McIllvaigh and Patrick Whalen (now deceased), first cousins; Agnes McDonald Frances, Georgie McDonald Reed, Walter R. McDonald, Grace C. McDonald, Mary McDonald Rundle, Mary Pyne, Margaret Pyne and Thomas Pyne, children of first cousins, who predeceased the testator. All other claimants have failed to establish their status. Their claims are, therefore, dismissed. The heirs at law and next of kin of the decedent on the maternal side of the family are those listed as such in Schedule L of the account.

Submit decree on notice settling the account in accordance with this decision.