MATTHIAS AALHOLM et al., as Executors of WILLIAM A. KENNEALLY, Deceased, Plaintiffs, *v.* THE PEOPLE OF THE STATE OF NEW YORK, Defendant.

In the Matter of the Petition of JOHN KENNEALLY, as Heir at Law and Next of Kin of WILLIAM A. KENNEALLY, Deceased, Appellant; THE PEOPLE OF THE STATE OF NEW YORK et al., Respondents.

Evidence — declarations in regard to pedigree and family relationship — rules regulating admission of such evidence — proceeding by alleged half-brother of decedent to obtain property turned over to state to await appearance of claimants — insufficiency of proof offered to establish petitioner's relationship to decedent.

1. Declarations in regard to pedigree, although hearsay, are admitted on the principle that they are the natural effusions of persons who must know the truth and who speak on occasions when their minds stand in an even position without any temptation to exceed or fall short of the truth. The admissibility of such declarations is subject to three conditions: 1. The declarant must be deceased. 2. They must have been made *ante litem motam, i. e.*, at the time when there was no motive to distort the truth. 3. The declarant must be related either by blood or affinity to the family concerning which he speaks.

2. Such declarations are not competent, unless there is some proof *dehors* the declarations themselves that the declarant was related to the family which the declarations are intended to affect, although slight proof of the relationship will be sufficient.

3. Testator died in 1868, leaving a will in which he requested his executors to make inquiry for a brother from whom he parted in Canada about forty years before that time. The petitioner asserts that he is a half-brother of testator and entitled as such to at least part of his estate, which is now in possession of the state. The testator was the son of a sergeant in the British army named John Kenneally, by a wife whose maiden name was Mary Finn. The petitioner claims that he is a son of the same Sergeant John Kenneally by another wife. The evidence to sustain this claim consists of declarations by his mother made to petitioner and to his half-sister, testified to by himself and by the children of the half-sister, to the effect that Sergeant John was her second husband and was the

father of petitioner. The petitioner has no recollection of his father. *Held*, that proof of the marriage of the petitioner's mother to Sergeant John Kenneally is essential to establish the petitioner's relationship to the testator. There is no such proof in the case at bar, unless the mother's unsupported declaration is competent evidence of the asserted relationship, and this is inadmissible.

*Aalholm* v. *People*, 157 App. Div. 618, modified.

(Argued April 20, 1914; decided June 2, 1914.)

APPEAL from an order of the Appellate Division of the Supreme Court in the first judicial department, entered October 3, 1913, which reversed an order of Special Term directing the state treasurer to pay to the petitioner, as sole heir and next of kin of William A. Kenneally, deceased, certain moneys and personal property theretofore turned into the treasury of the state of New York pursuant to an order of the Supreme Court and dismissed the proceeding.

The facts, so far as material, are stated in the opinion.

*Louis Marshall, J. Van Vechten Olcott, Edward K. Sumerwell* and *Nelson H. Tunnicliff* for appellant. It was error for the Appellate Division to dismiss the appellant's petition on the theory that, even if the declarations on which the appellant relies were admissible, the finding that he is the son of Sergeant John Kenneally and the half-brother of the decedent was not supported by evidence sufficient to uphold the determination of the Special Term. (*Merges* v. *Ringler*, 158 N. Y. 701; *Matter of Regan*, 167 N. Y. 338; *Matter of King*, 168 N. Y. 53; *Matter of Board of Education*, 169 N. Y. 456; *Matter of Earnshaw*, 196 N. Y. 330; *Velleman* v. *Rohrig*, 193 N. Y. 439; *Conlon* v. *Kelly*, 199 N. Y. 43; *Matter of Carnegie Trust Co.*, 206 N. Y. 394; *Hirshfield* v. *Fitzgerald*, 157 N. Y. 66; *O'Brien* v. *East River Bridge Co.*, 161 N. Y. 539.) The testimony of the appellant and of his Cleveland relatives as to his pedigree derived as it was from the declarations of his mother and half-sister made *ante litem motam*, was competent within the well-

recognized exception to the rule relating to hearsay evidence. (*Whitelock* v. *Baker*, 13 Ves. 514; *People* v. *Fulton Fire Ins. Co.*, 25 Wend. 205; *Fulkerson* v. *Holmes*, 117 U. S. 389; *Eisenlord* v. *Clum*, 126 N. Y. 552; *Matter of Estate of Hurlburt*, 68 Vt. 366; *Rollins* v. *Atlantic City Ry. Co.*, 73 N. J. L. 64; *Layton* v. *Kraft*, 111 App. Div. 842; *Young* v. *Shulenberg*, 165 N. Y. 385; *Monkton* v. *Atty.-Gen.*, 2 Russ. & Myl. 147; *Robson* v. *Atty.-Gen.*, 10 Cl. & Fin. 471; *Matter of Hartman*, 157 Cal. 206; *Sitler* v. *Gehr*, 105 Penn. St. 592; *Mann* v. *Kavanagh*, 110 Ky. 776; *Robb's Estate*, 37 S. C. 19; *Scheidegger* v. *Terrell*, 149 Ala. 338.)

*Thomas Carmody, Attorney-General (August Merrill* and *Francis L. Ganley* of counsel), for respondents. Before the declarations of Mary Hardiman Moan and Margaret Kearns Hardiman were received it should have appeared that they were related by blood or marriage to William A. Kenneally, the decedent. (*Fulkerson* v. *Holmes*, 117 U. S. 397; *Blackburn* v. *Crawford*, 3 Wall. 175; *Young* v. *Shulenberg*, 165 N. Y. 385; *Layton* v. *Kraft*, 111 App. Div. 842; *Jewell* v. *Jewell*, 1 How. 219; *Green* v. *Almand*, 111 Ga. 735; *Atty.-Gen.* v. *Kohler*, 9 H. L. Cas. 685; *Jackson* v. *Jackson*, 80 Md. 194; *Washington* v. *B. S. Co.*, 171 N. Y. 166.)

WERNER, J. The state has in its possession money and property aggregating over $50,000 in amount and value, which it received from the estate of one William A. Kenneally, who died testate in the city of Brooklyn in 1868. No person entitled to this property could be found, and it was turned over to the state to await the appearance of claimants. Many persons, to the number of one hundred or more, have at different times presented their claims, based on their alleged relationship to the testator, but none was successful until the present petitioner appeared and satisfied the referee of the validity of his claim.

The petitioner and appellant, John Kenneally, asserts that he is a half-brother of the testator, and entitled as such to at least one-half of the fund held by the state. He instituted this proceeding in November, 1910, under the provisions of section 2747 of the Code of Civil Procedure. A referee was appointed to hear and determine the issues. After a careful and painstaking review of the evidence the referee reached the conclusion that the petitioner had proved his relationship to the testator, and that he was entitled to the whole of the fund because there appeared to be no other persons in existence who had any right to share therein. The court at Special Term confirmed the referee's report. Upon appeal to the Appellate Division this determination was reversed upon the facts and the law, and the petition was dismissed.

The principal reason assigned by the Appellate Division for its reversal was, that the referee had erred in receiving incompetent evidence, consisting of declarations said to have been made by the petitioner's mother and his half-sister, for the purpose of proving the petitioner's relationship to the testator's father, one Sergeant John Kenneally, and, through this connection, his relationship to the testator. The ground on which these declarations were held to be incompetent is that there was no evidence, except the declarations, to prove the declarant's relationship to the testator's family. This presents the important question on this appeal. The referee and the court at Special Term held that these declarations were competent evidence of the petitioner's claim of relationship to the testator. The Appellate Division took the contrary view, and further held that, even if the declarations were competent, the evidence was yet insufficient to prove the petitioner's claim. This latter question we need not consider for reasons to which we shall advert further on.

The testator, William A. Kenneally, was the son of a sergeant in the British army named John Kenneally, by a wife whose maiden name was Mary Finn. The peti-

tioner says he is also a son of the same Sergeant John, but by another wife. If this claim is well founded, it follows that he is a half-brother of the testator. The only evidence of the petitioner's relationship to Sergeant John, and through him to the testator, consists of declarations made to the petitioner by his mother, who has been dead many years; and by the petitioner's half-sister, who is also dead, to her children who are the petitioner's nephews and nieces. The testimony as to these declarations is given by the petitioner and these nephews and nieces.

The question at issue will be the better understood if we separate the evidence into two parts, dealing first with that which relates to the pedigree of the testator, and then with so much as bears upon the pedigree of the petitioner, for the purpose of determining whether there is any evidence by which the two are connected.

*First.* The testator, William A. Kenneally, died in Brooklyn in 1868, leaving a will in which he stated: " It is now about forty years since I parted with my brother Edward. The separation took place in Canada at a place called Amherstburg. He was going to the State of Michigan. Edward was born on the 30th of July, 1813, in England. Our father's name was John. Our mother's maiden name was Mary Finn. Our parents were both natives of Ireland. I desire particularly my executors to make diligent inquiries and search, particularly about Ann Arbor, Michigan, and to discover if possible my long lost brother."

It is not disputed that the testator's father was one John Kenneally, a sergeant in the British army, attached to the 68th Infantry. He was married in Ireland to Mary Finn. After his marriage, and from 1827 to 1829, he was stationed at Amherstburg in Canada, where he had with him his wife and two sons; William, then about fifteen years of age, and Edward, about three years younger. In 1829 Sergeant John returned to England with his

regiment, leaving his wife and two sons in Amherstburg. Shortly after his departure, his wife left Amherstburg for Ann Arbor, Michigan, taking with her the younger son Edward, and no trace has since been discovered of either. The son William remained in Amherstburg in the care of a Catholic priest called Father Fluett, until 1831, when he came to this country. Sergeant John, upon his return to England, entered a hospital as an invalid. He was discharged from the hospital on January 30th, 1830, on a pension of six pence per day. In the same year he was transferred to Quebec. After his return to Canada, and in 1832, he commuted his pension at York (now Toronto) for 200 acres of land on the Penetanguichene road. Here ends all authentic evidence relating to Sergeant John.

*Second.* The petitioner, John Kenneally, is a resident of Idaho City, Idaho. He has there occupied various public positions and is evidently a man of good repute. According to his testimony he was born in 1833 at Falls View, Canada, just opposite the present city of Niagara Falls in this state. His mother was Margaret Kearns Hardiman. He lived with his mother who moved to Cleveland, Ohio, where she died in 1845 or 1846, when the petitioner was twelve years of age. The petitioner has no recollection of his father, who died when the petitioner was between two and three years of age. The petitioner testified that his mother had told him that she had married John Kenneally, who was a soldier in the British army; that she was then a widow, and he a widower who had two sons by a former wife whom he had left at Amherstburg, Canada; that when they were married she was a laundress and he was a waiter for a man named Adam Crysler at Falls View; that they subsequently moved to Cleveland; that he had a patent for crown lands in the locality of Georgian Bay which he was anxious the petitioner should have, and that she had been possessed of certain personal belongings of his, such

as a soldier might have, which had been destroyed in a conflagration in Cleveland.

The petitioner had a half-sister, Mary Hardiman, who died in Cleveland in 1885. She and the petitioner lived with their mother in Cleveland for two years prior to the mother's death. This half-sister married a man by the name of Moan and by him had five children. These children testified to the declarations of their mother concerning declarations made to her by her mother. To state it differently, these witnesses repeated the declarations of their mother, Mary Hardiman, as to matters which she said had been told by her mother, Mary Hardiman Kenneally. These declarations were to the effect that Sergeant John had been the second husband of Mary Hardiman Kenneally and was the father of the petitioner.

Thus we have the statements of the petitioner as to declarations made to him by his mother concerning his relationship to Sergeant John, and the statement of the children of petitioner's half-sister as to similar declarations made by her in repetition of what she had been told by her mother. This is all the evidence which in any wise tends to prove petitioner's relationship to the testator, and it is of course apparent that if the declarations of petitioner's mother are not alone sufficient to prove her marriage to Sergeant John, the petitioner's claim cannot be sustained. These declarations were duly objected to on behalf of the state and the exceptions taken to their admission in evidence raise the question to be determined.

Declarations in regard to pedigree, although hearsay, are admitted on the principle that they are the natural effusions of persons who must know the truth and who speak on occasions when their minds stand in an even position without any temptation to exceed or fall short of the truth. (*Whitelocke* v. *Baker*, 13 Vesey, 514; *Berkeley Peerage Case*, 4 Camp. 401.) The admissibility of such declarations is subject to three conditions: 1. The declarant must be deceased. 2. They must have been made

*ante litem motam, i. e.,* at the time when there was no
motive to distort the truth.    3. The declarant must be
related either by blood or affinity to the family concern-
ing which he speaks.  The declarations which we are
considering concededly conform to the first two of these
conditions.    The question here is whether they come
within the third.    The learned counsel for the respondent
contends, and the Appellate Division has held, that the
declarations of the petitioner's mother, Margaret Kearns
Hardiman, as to her marriage to Sergeant John Ken-
neally, are not alone sufficient to bring them within that
part of the rule requiring the declarations to be made by
a member of the family concerning which they are
advanced.    More concretely stated, the decision is that
such declarations are not competent, unless there is some
proof *dehors* the declarations themselves, that the declar-
ant was related to the family which the declarations are
intended to affect.    Counsel for the appellant insists, on
the other hand, that these declarations, if taken as true,
are shown to have been made by a member of the family
of Sergeant John; and the contention in this regard
seems to be that the declarations themselves supply the
necessary corroborative testimony.

In *Blackburn* v. *Crawfords* (3 Wall. 175, 187) it was
sought to prove that certain persons were nephews and
nieces of one Dr. Crawford, whose estate they claimed.
They were children of a woman who, it was claimed, had
married a brother of Dr. Crawford.    This marriage was
disputed.    The declarations of a sister of the mother of the
claimants were received in evidence to the effect that the
mother had told her that she had married a brother of
Dr. Crawford.    These declarations were objected to on
the ground that the declarant was not shown to be related
to the family of Dr. Crawford.    In sustaining this objec-
tion the United States Supreme Court, speaking by Mr.
Justice SWAYNE, said: "It is well settled, that before the
declaration can be admitted, the relationship of the

declarant to the family must be established by other testimony. Here the question related to the family of Dr. Crawford. The defendants in error claimed to belong to the family, and to be his nephew and nieces. To prove this relationship, it was competent for them to give in evidence the declarations of any deceased member of that family. But the declarations of a person belonging to another family — such person claiming to be connected with that family only by the intermarriage of a member of each family — rests upon a different principle. A declaration from such a source, of the marriage which constitutes the affinity of the declarant, is not such evidence *aliunde* as the law requires." In *Fulkerson* v. *Holmes* (117 U. S. 389, 397) the heirs of one John Holmes claimed to be the owners of land patented to Samuel C. Young. Their claim rested upon recitals in a deed by Samuel C. Young to John Holmes in which Samuel C. was stated to be the son of Samuel Young, the original patentee. This deed, which was many years old, was found among the papers of John Holmes after his death, and had been acknowledged before a United States district judge. In that case the court said: "The rule is that declarations of deceased persons who were *de jure* related by blood or marriage to the family in question may be given in evidence in matters of pedigree. (Citing cases.) A qualification of the rule is, that, before a declaration can be admitted in evidence, the relationship of the declarant with the family must be established by some proof independent of the declaration itself. (Citing cases.) But it is evident that but slight proof of the relationship will be required, since the relationship of the declarant with the family might be as difficult to prove as the very fact in controversy." It was there held that the recitals in the deed, supported by the age of the instrument and the manner of its execution, furnished slight but sufficient evidence tending to establish the fact set forth in the recitals. A similar situation was presented to this court

in *Young* v. *Shulenberg* (165 N. Y. 385, 388). The rule in the *Fulkerson* case was there followed and was thus stated by Judge VANN: "While the law required that her (the declarant's) relationship to the Ellice family should be shown by evidence independent of her own declarations, still, as was recently held in an important case, 'but slight proof of the relationship will be required, since the relationship of the declarant with the family might be as difficult to prove as the very fact in controversy.'" (Citing *Fulkerson* v. *Holmes, supra.*)

This important qualification as to the degree of proof required to establish a declarant's connection with the family which is the subject of his declarations is based upon sound reason, and is supported by the weight of authority. If such declarations, in and of themselves and without other evidence, are to be held sufficient to establish a declarant's relationship to a particular family, we may as well frankly ignore the third condition of the rule, to which we have adverted, requiring that a declarant must be shown to be a member of a family before his declarations concerning its pedigree are competent. The reason of the matter is very felicitously stated by Mr. Wharton, where he says of a declarant, " it would be a *petitio principii* to say that his declarations are receivable because he is a member of the family, and he is the member of a family because his declarations are receivable." (Wharton's Ev. sec. 218.)

The qualification is one of growing importance. Without it a person may establish his relationship to any family he chooses by simply stating that he has heard from a member of his family a recitation of the facts establishing the desired connection. In this country, filled with densely crowded cities in which large fortunes are no longer rare, it will be wiser and safer to maintain this rule, circumscribed by this qualification, than to relax it even in cases that appear to be meritorious. It may prove a hardship now and then to require even slight

evidence of the relationship of a decedent to the family of which he declares before his declarations will be received, but the consequences of the contrary rule would inevitably be much more serious.

With a single exception the English cases sustain this qualification. (*Plant* v. *Taylor*, 7 Hurl. & N. 211, 237; *Hitchins* v. *Eardley*, L. R. [2 P. & D.] 248; *Smith* v. *Tebbitt*, 1 id. 354; *Atty.-Gen.* v. *Kohler*, 9 H. L. Cases, 660.) It is also the rule in other states. (*Northrop* v. *Hale*, 76 Me. 306; *Wise* v. *Wynn*, 59 Miss. 588; *Anderson* v. *Smith*, 2 Mackey [D. C.], 281; *Lanier* v. *Hebard*, 123 Ga. 633.) The exception referred to is found in a case, cited by counsel for the appellant, which seems in theory to uphold the qualification above set forth, but in fact ignores it. In *Monkton* v. *Atty.-Gen.* (2 Russell & Mylne, 147) a narrative written by one John Troutbeck, purporting to give a genealogical account of his family, was admitted in evidence as a declaration to prove the relationship of the claimants to the testator, Samuel Troutbeck. John Troutbeck, the declarant, who had died prior to the trial, was a member of the family of the claimants; but if we read the facts aright there was no other evidence connecting the two families. Lord BROUGHAM there said: "I entirely agree, that in order to admit hearsay evidence in pedigree, you must, by evidence *dehors* the declarations, connect the person making them with the family. But I cannot go the length of holding, that you must prove him to be connected with both the branches of the family, touching which his declaration is tendered. That he is connected with the family is sufficient; * * *. To say that you cannot receive in evidence the declaration of A, who is proved to be a relation by blood of B, touching the relationship of B, with C, unless you have first connected him, also by evidence *dehors* his declaration, with C, is a proposition which has no warrant either in the principle upon which hearsay is let in, or in the decided cases." This case is often cited

and has been the subject of much comment; and it seems to have produced most of the confusion in which this subject of pedigree is involved. When that case came before the House of Lords upon an appeal in a subsequent proceeding (*sub nom. Robson* v. *Atty.-Gen.*, 10 Clark & Fin. 471) this question was not passed upon, and in respect of the admissibility of the narrative of John Troutbeck, the court plainly stated that it desired to be " understood as not expressing any opinion as to the admissibility of it in point of law." In *Wise* v. *Wynn* (*supra*) the *Monkton* case was commented upon as follows: " The same doctrine (*i. e.*, requiring proof *dehors* the declarations) is announced in *Monkton* v. *Atty.-Gen.*, 2 Russ. & Myl. 147, though it may perhaps be doubted whether the conclusion reached in that case does not offend against the doctrine." *Sitler* v. *Gehr* (105 Pa. St. 592) and *Estate of Hartman* (157 Cal. 206) are in the same category with the *Monkton* case. That case also appears to be vouched for by no less an authority than Professor Wigmore in his well-known work on Evidence (Vol. 2, § 1491). If we read him aright he expresses the view that the *Monkton* case sets forth the true doctrine, and he argues, in effect, that when a declarant is shown to be connected with the family whose relationship with another family is in dispute, his declarations are competent without any independent evidence connecting the two. This statement of the rule, it seems to us, is too broad. When a declarant who claims relationship by consanguinity has been shown to be a member of one branch of a family, it is of course not necessary to prove him also related to the other branch in order to make his declarations competent; but until there is some independent evidence connecting his family with the other family, the case is not brought within the qualification of the rule which is supported by the great weight of authority. Much more is this qualification to be observed in cases of asserted relationship by affinity, as in the case of the

declarant upon whom the petitioner relies to prove his consanguinity to the testator. Proof of the marriage of the petitioner's mother to Sergeant John Kenneally is essential to establish the petitioner's relationship to the testator. There is no such proof in the case at bar, unless we accept the mother's unsupported declarations as evidence of the asserted relationship, and this we regard as inadmissible.

There are a few jurisdictions in which it has been held that the declarant need not be related, either by blood or marriage, to the family of which he declares. It is of course the logical corollary of this unqualified rule that the declarations of any person who claims to know the facts are to be regarded as competent, whether he is or is not related to the family of whose pedigree he speaks. The reasoning in support of this relaxed rule is well illustrated in *Carter* v. *Montgomery* (2 Tenn. Ch. 216, 227, 228), where the prevailing English and American rule is very clearly stated. "In England," says Chancellor COOPER of Tennessee, "it is now well settled that hearsay evidence is resorted to in matters of pedigree, upon the principle of declarations forming a part of the *res gestœ*, and therefore original evidence, upon the ground of the interest of the declarants in knowing the connections of the family. The rule is, consequently, restricted to the declarations of deceased persons who were related by blood or marriage to the person from whom the descent is claimed, and general repute in the family proved by a surviving member. (*Vowles* v. *Young*, 13 Vesey, 140; *Whitelock* v. *Baker*, Id. 514; *Doe* v. *Griffin*, 15 East, 293.) This doctrine is comparatively recent, even in that country, and, although the weight of American authority is tending in the same direction, there are many respectable decisions which make no such limitations. (*Barnet* v. *Day*, 3 Wash. C. C. 243; *Jackson* v. *Cooley*, 8 Johns. 128; *Pegram* v. *Isabell*, 2 Hen. & M. [Va.] 193; *Walkup* v. *Pratt*, 5 Har. & J. [Md.] 51.) It is obvious that while the

English rule may be most consonant to sound principle, and may answer the ends of justice in a dense population and settled community, yet it scarcely suffices in a sparsely inhabited country with a migratory and rapidly changing population. It would be utterly inadequate in matters relating to a slave population, where the family is not legally recognized, and, for the same reason, to the settlement of the rights of illegitimates. Where would the negro have been in suits for freedom, after a few years, on a change of domicile by the master, with the presumption of slavery against them by reason of color, if the English rule had been rigidly adhered to? In this state we have departed from it, and allow hearsay from other than members of the family and public repute in the community." This Tennessee case is fairly typical of a few others, which we deem it unnecessary to cite.

We live in a state where the social conditions, no less than the rapid growth of our population and the constant increase of similar family names, are urgent reasons for preserving the rule in its integrity. Identity of names, religion and nativity are too common to be alone sufficient evidence of family connections. Any extension of the hearsay rule in regard to pedigree, permitting declarations by persons not related by blood or marriage to the person from whom descent is the matter in issue, would open the door to frauds and uncertainties which should not be invited or encouraged.

The petitioner's case, whatever its merit, fails at the point of greatest importance, because it lacks the support of any evidence, aside from the declarations testified to by him and his nephews and nieces, which tends to establish his relationship to Sergeant John Kenneally, and through him to the testator William A. Kenneally. We agree, therefore, with the Appellate Division, in the conclusion that the petitioner has not proved his right to the money and property of William A. Kenneally's estate, now in the custody of the state.

The Appellate Division not only reversed the order of the Special Term, but dismissed the petition. If the Appellate Division intended to exercise the power which it now has under section 1317 of the Code of Civil Procedure, it should have made findings of fact which would support such a final determination. (*Bonnette* v. *Molloy*, 209 N. Y. 167.) We think this is not a case in which the courts can hold as matter of law that it will be impossible for the petitioner to succeed upon a new hearing, for he may be able to adduce additional facts to support his claim.

The order of the Appellate Division should be modified by directing a new hearing, and as so modified affirmed, without costs to either party in this court.

WILLARD BARTLETT, Ch. J., HISCOCK, CHASE, COLLIN and CUDDEBACK, JJ., concur; HOGAN, J., not sitting.

Ordered accordingly.