William E. Foulkes, Claimant as Heir to the Estate of Edward W. Morrison, Deceased, Plaintiff in Error, v. Chicago Title and Trust Company, Executor of the Estate of Edward W. Morrison, Deceased, Defendant in Error.

Gen. No. 37,909.

Opinion filed December 30, 1935.

FRANK H. REPETTO, of Chicago, for plaintiff in error; ROBERT D. MELICK, of Chicago, of counsel.

MATTHIAS CONCANNON and JACOBSON, MERRICK, NIERMAN & SILBERT, all of Chicago, for defendant in error.

MR. JUSTICE FRIEND delivered the opinion of the court.

Edward W. Morrison died testate December 14, 1929, and by the provisions of his last will and testament, admitted to probate June 13, 1931, disposed of his entire estate. In a proceeding originated in the probate court under the Ascertainment of Heirship Act of 1909 (secs. 1 to 3, pars. 146 to 148, chap. 3, Cahill's Ill. Rev.

Stats. 1933, p. 67) William E. Foulkes (hereinafter referred to as claimant), claimed to be a son of Edward W. Morrison, the decedent, and his only heir at law and next of kin; Margaret Anna Burnstein Beers Brown (hereinafter called Margaret Brown), and Alice Schenker claimed to be the adopted daughters of decedent; and 16 collateral heirs by blood of decedent claimed to be the nearest of kin and his heirs at law. The probate court, by its order of June 16, 1931, found the 16 collateral heirs to be the nearest of kin and heirs at law of decedent; that claimant was not a son; and that the adoption decrees under which Margaret Brown and Alice Schenker claimed were void. From this order of the probate court two appeals were perfected, one by claimant and the other by Margaret Brown and Alice Schenker. These appeals were consolidated for hearing in the circuit court, the cause heard by the court and a final decree entered October 14, 1932, sustaining in all particulars the findings and order of the probate court. October 19, 1934, a writ of error was sued out to reverse the decree of the circuit court. Since neither Margaret Brown nor Alice Schenker were named as parties to the writ of error, we are not called upon to pass upon the validity of the adoption proceedings, and therefore the sole question for determination is whether claimant was the son of Edward W. Morrison.

In support of his claim Foulkes filed an affidavit stating that he was born in Chicago, April 17, 1859; that his mother, named Mary Morrison, was married to Edward W. Morrison; that her maiden name was Mary Prange; that she resided in the household of James M. Morrison, father of decedent, up to the date of claimant's birth; that prior thereto there had been a marriage ceremony, common to that time, between his parents. The affidavit further states that after claimant's birth James M. Morrison, decedent's father,

objected to the marriage of his son, and thereafter claimant's mother was compelled to leave the household of James M. Morrison and a separation followed between claimant's mother and father; that when claimant was about seven years of age his mother died and he was reared in the family of one Edward Foulkes, and was thereafter called William Foulkes and has since borne that name; that Edward Foulkes was engaged in the occupation of canal boat captain, and as a boy claimant came in contact with one Mr. Dunnivan, also a captain on a canal boat, who well knew the matters recited in claimant's affidavit; and that upon the information thus received from Dunnivan, claimant makes said affidavit and believes it to be true. It is further stated that since deriving the foregoing information from Capt. Dunnivan, claimant has learned of corroborating facts and circumstances in relation thereto, consisting of statements made by Edward W. Morrison, decedent, during his lifetime in conversation with relatives and acquaintances, to the effect that he had been married and as the result of said marriage a son was born unto him and Mary Prange, and that Edward W. Morrison, decedent, often sought the whereabouts of claimant, his son; that when claimant was about 20 years of age he met Capt. Dunnivan, whom he had known for some time, and in the course of conversation Dunnivan said to claimant, "Do you know that your father is Edward W. Morrison," and "On my return trip I am going to take you to him"; that Capt. Dunnivan left on a voyage and died en route. The claimant concludes his affidavit by stating that "from matters of recollection and corroborative information, he is the son of Edward W. Morrison deceased, and makes this affidavit in support thereof."

The essential facts, so far as they are necessary for a consideration of the issues involved, disclose that Edward W. Morrison was born in 1836 and died Decem-

ber 14, 1929, at the age of 93 years. He was the son of James M. Morrison by his first wife. James M. Morrison died in 1868, leaving surviving his second wife, who afterward became Mary A. King, Edward W. Morrison, and another son, Volney Adams Morrison, who died June 14, 1869, after the death of his father. James M. Morrison left a large and valuable estate, and substantially all the property owned by Edward W. Morrison in his lifetime came to him through the will of his father. This will was admitted to probate in Cook county prior to the great Chicago fire, wherein the will and the records thereof were destroyed. The will was re-established and restored in a burnt record proceeding filed in 1873. In a suit instituted by the conservator of Edward W. Morrison in 1921 it was decreed that by reason of the prior death of Volney Adams Morrison without ever having had a child or children, Edward W. Morrison had obtained a fee simple title to the parcels of property in question, subject to the dower of Mary A. King in a portion thereof, and that the city of Chicago, in trust for the use of the schools, had no interest therein.

There is no record of a marriage or divorce between Edward W. Morrison and Mary Prange. The only evidence on that subject consists of declarations made by members of the Prange family and declarations alleged to have been made by Morrison to several other witnesses. George A. Kramer, who had a saloon and restaurant at 35th street and Cottage Grove avenue in Chicago for many years, testified that he knew Capt. Morrison, as Edward W. Morrison was called, for more than 25 years prior to his death, and that he had several conversations with him in the saloon wherein Morrison stated that he had a son whom he had not seen but longed to see and did not know where he was, and that his wife was dead; that he was shown a picture by claimant's daughters, and when he looked at it said, "That is Capt. Morrison," whereupon one of the

daughters replied, "No that is my father," and that he, Kramer, then said, "He looks just like Capt. Morrison." When claimant was asked to arise in the court room, the witness identified him as being the man of whom he had been shown a picture by claimant's daughters which he had identified as that of Capt. Morrison, and testified that the picture, which was admittedly one of William E. Foulkes, was the one he recognized as Capt. Morrison.

Frank D. Spalding was another witness called on behalf of plaintiff. He testified that he knew Kramer, and had been in his place of business; that not long after the Spanish American war he met Edward W. Morrison and talked to him many times, and particularly in 1901, when the witness bemoaned the fact that he had lost his son in the Spanish American war, whereupon Morrison remarked, "You'll get over that, losing your son. I lost a son myself, and I had to get over it."

David J. Haynes testified in behalf of claimant that he was a police officer and had met Edward W. Morrison in Kramer's saloon about 1907 or 1908; that the last conversation he had with him took place in Douglas square on 35th street at the lake, near Kramer's saloon, in which Morrison told him that his wife was dead, and that when he went to the place where she had died they told him the boy was dead also; that Morrison further said, "The wife's name was Mary and that her maiden name was Pronga, Mary Pronga," and that the boy's name was Willie. The witness recalled that Morrison stated that he had missed the boy, and that "Mary was the prettiest woman he ever saw, and the only woman he ever loved," and related how they were married and lived on the west side a while and that his folks had separated them, and "after they left Chicago they went down somewhere on the canal, . . . and it seems that they went down there when I was away"; that when he returned he tried to find them, but was informed that his wife and son were dead.

Mrs. Clara Bahr, another witness produced on behalf of claimant, testified that she was 65 years old and was born in Chicago, where she lived until she was 15 years of age. She then went to Akron, Ohio, where she has lived ever since; that her father, William Prange, and William Foulkes' mother, Mary Prange, were brother and sister. She stated that when she was between 9 and 15 years of age she heard her father say to her mother, "Sister Mary has been deserted by her husband and left a little boy"; that she remembered hearing her mother say that Mr. Morrison came to their grocery store in Chicago and that he said to her mother, "Willie's father came to look for him"; that after she moved to Akron, Ohio, when she was between 15 and 16 years of age her mother told her that Willie Foulkes was Mary's boy, and that his father's name was Morrison; that Mary, the sister, lived with them in Chicago, and that her mother had told her, "Mary came to their house and told them her husband sent her there to stay until he came after her"; that she remembered Willie when he was nine or ten years old, that no one ever called him Morrison in her presence but always referred to him as Willie Foulkes.

Mrs. Lily Bowen testified on behalf of claimant that she lived in Oak Park and was 57 years of age; that her mother's maiden name was Wilhelmina Prange and that Mrs. Bahr was her first cousin; that Mrs. Bahr's father and the witness' mother were brother and sister, and she, the witness, lived with her parents until her marriage on January 30, 1900; that prior thereto she heard conversations between her mother and father concerning matters of descent and relationship; that in August, 1893, in their home in Alliance, Ohio, her mother said she never recognized any marriage to Capt. Foulkes because she knew of no divorce from Morrison, that it was her duty to bring the son and the father together; that her mother knew Willie Foulkes

very well and she heard her mother say that she wanted to bring Edward W. Morrison and Willie Foulkes together a great many times and wanted to come to Chicago and find them. At the time of these conversations witness was about 12 to 14 years of age. Mrs. Bowen testified that she never told Mr. Foulkes that her mother wanted him to come back to his father, Edward Morrison, but left that to her mother; that she, the witness, usually visited Willie Foulkes with her husband; that she never saw her aunt, Mary Prange, who was supposed to have a husband by the name of Edward Foulkes, but that the witness' mother never recognized him as her husband. She testified further that her mother said that Mary Prange was never divorced from Edward Morrison, to her knowledge, and that she could not be legally married to Edward Foulkes. Witness further testified that when her Aunt Mary came to this country she was just a girl and went to work as a maid in the Morrison home on Harrison street in Chicago, and that her mother had often told her that Willie was born on Harrison street in the Morrison home, but that she had never talked to Mr. Foulkes nor to anybody else about the Morrison home; that all the circumstances about which the witness testified happened before she was born, and substantially all her testimony relates to statements made to her by her mother.

There is evidence in the record tending to show that claimant was born April 17, 1859. He was employed as a mail carrier at Chicago in the general post office. The records of that office, photostatic copies of which were offered in evidence, show that on November 20, 1900, claimant stated that he was born on April 17, 1859, and resided at 3440 Emerald avenue in Chicago at the time of his appointment; that on August 14, 1907, in reply to certain questions contained in a questionnaire for the post office department he stated that he had been in the

service in Chicago for 20 years, was born here April 17, 1859, and was 48 years of age; that on July 1, 1916, he filled out a questionnaire as an employee of the post office at Chicago, stated that he was born in April, 1859, and that the total length of his service in the post office department was 28 years and four months; that the records of the Veterans Administration Bureau of Pensions at Washington, D. C., show an application for an annuity pension which was signed and sworn to by claimant March 22, 1924, recited, among other things, that claimant was born April 17, 1859, age 65 years, and was a city letter carrier in the classified service.

In addition to this documentary evidence there was the testimony of Clara Bahr, claimant's cousin, who stated that she left Chicago when she was 15 years of age, about the year 1881, and that claimant was then about 22; also that claimant was about six or seven years older than she was, which would fix his birth approximately in the year 1859. There is also the baptismal record of the German Evangelical Lutheran Church of Chicago, and the testimony of Edwin Hoelter, pastor of that church, that a baptismal ceremony was performed by the then pastor of that church June 30, 1859, with respect to one Ernest, born April 17, 1859, whose parents were Jacob Meck and Mary, née Prange, the sponsor being William Prange, who was represented by the mother of the child.

The date of claimant's birth becomes of considerable importance in the light of testimony offered by the executor after claimant had thus established the date of his birth as April, 1859, showing that Edward W. Morrison was absent from the United States from November 2, 1857, to December 24, 1859. This evidence consisted of photostatic transcripts of the record in the office of the Deputy Collector of Customs at the Port of New Bedford in the District of Massachusetts, containing a list of sailors and the members of the crew

of the ship Levi Starbuck, which left the port of New Bedford on November 2, 1857; photostatic copies of the crew list, showing as a member of the crew the name "E. W. Morrison," reciting place of birth as Chicago, age 22, height 5 feet, 10½ inches, complexion light, hair light, with a certificate of the master that the entire crew list is correct and certified; also in the same certificate the return of the ship and the surrendering of the crew list on September 17, 1861. The list is certified to by the collector of the port, and given under his hand and seal as of November 2, 1857. The document is entitled, "List of Persons That Accompanied the Crew of the Ship Levi Starbuck of New Bedford, bound for Pacific Ocean." There was also offered in evidence a certificate by Arthur E. Duffy, deputy collector of customs, certifying that the name of E. W. Morrison, birthplace Chicago, age 22, height 5 feet, 10 inches, complexion light, hair light, appears in the crew list of the ship Levi Starbuck that cleared at this point (New Bedford) November 2, 1857, for a whaling voyage in the Pacific ocean, and that the vessel returned September 17, 1861. The evidence contains a certificate attached to the crew list of the ship Levi Starbuck, showing that Edward W. Morrison was discharged at Honolulu, Hawaiian Islands, December 24, 1859, before Abner Pratt, American consul at that place. To it was attached a copy of the record of the consul of the United States of America for Honolulu, Hawaiian Islands. An attached consul's report recites, among other things, that Edward W. Morrison was discharged at his request from the Levi Starbuck in accordance with the law of the United States at Honolulu, December 24, 1859. There was further offered in evidence an envelope, with the superscription, "Mr. Edward W. Morrison, Honolulu, Sandwich Islands, in care of the Levi Starbuck," and with a post mark thereon of "Chicago, July, 1859," and a letter which was

contained therein. Both envelope and letter were found among Edward W. Morrison's papers after his death, and were from his father, James M. Morrison. The letter begins as follows: "My dear son: We received your letters dated April 28th, . . ." It is a rather lengthy and affectionate document, and contains the following: "I have prayed for you every day since you have gone, that the Lord would protect you on the mighty deep and in your business on the great waters . . . My son, E. W. Morrison, I have written to Cleveland as you wanted me to and I shall write to Captain Jarnegan to let you come home if he will, you may tell him that I will pay him for your time if he will discharge you, if not, don't leave the ship unless you can get away for good."

In addition to the foregoing testimony pertaining to the date of claimant's birth, there is abundant evidence offered by the executor, and received by the court, tending to rebut the statements and declarations of claimant's witnesses relative to the alleged marriage of Edward W. Morrison and Mary Prange. One of these was Lydia A. Morrison, 76 years of age, whose husband, Ephraim, was a first cousin of Edward W. Morrison. She testified at length concerning the relationship of the 16 collateral relatives who were found by the court to be the heirs at law and nearest of kin of decedent, Edward W. Morrison. She stated that she knew James M. Morrison and his wife, and had seen them often. The witness resided in Chicago for more than 50 years. She testified that Edward W. Morrison's first wife's name was Emily Van Dusen, from whom he was divorced, and that she died more than 50 years ago. He was then married to Balbina Morrison. Witness was 18 years of age at the time, which would fix the second marriage at about 1874. She stated that Edward W. Morrison did not have a child or children that she had ever heard of.

George W. Rice, another witness, testified that he was 76 years of age, lived in the neighborhood of the Morrison home in 1868, and knew Edward W. Morrison in his lifetime. His mother frequently took him to the home to see Edward and his wife, Balbina. Mrs. Morrison and his mother were very intimate friends, and the witness continued to visit Morrison up to the time of his death. He stated that he had never heard Morrison speak of a child or mention anything about a son or that he ever heard of a son in that family or the mention of the name Prange. He testified to a conversation with Morrison before his death, wherein Morrison asked, " 'George, how many children have you got?' I said, 'I have got three big ones, Ed—two boys and a girl'; that Morrison said, 'Well one girl is worth forty boys.' Jokingly, I said, 'Yes, that is right, that is true.' I said, 'I believe you never had any.' I knew he had not.'' Morrison said he never had a boy or a girl.

Another witness, Sarah Rice Smith, testified that she was a daughter of Mrs. William Morrison, the widow of Ephraim Morrison, a first cousin of Edward W. Morrison, and lived in Chicago 52 years; that she had known Edward W. Morrison all his lifetime; that her father was always proud that he had five children, and ''joshed'' Edward W. Morrison because he had none, and that she never heard any talk in the family that Edward ever had a child or children. She stated further that she had heard conversations among members of the Morrison family on many occasions to the effect that Edward had been married twice, but she never heard that his wife was named Mary or Marie, or that her maiden name was Prange or Pronga.

Florence M. Spofford, another witness, stated that she was born in 1875; that her mother's name was Hannah Morrison Spofford. Witness is one of the 16 found to be heirs, and knew Edward W. Morrison, lived next door to him and used to spend a great deal of

time in his home. She lived on Harrison street, just east of Halsted street, and her home was just west of his. Her mother was a first cousin of Edward W. Morrison. She said that, although she was frequently in touch with Edward W. Morrison, she never heard of a Mary Prange; that Edward W. Morrison was married to a relative of some other member of the family, but she could not remember her maiden name; that his wife left very suddenly and was later remarried, and that Edward W. Morrison then married Bina Morrison. The witness said that she never heard of Edward W. Morrison having a son or of Mary Prange being associated with Edward W. Morrison or in the Morrison family.

There is the testimony of Glendora Morrison Connoran, who stated that she was 56 years of age, and a daughter of Mrs. William Morrison, widow of Ephraim Morrison, a first cousin of Edward W. Morrison. She was born on Monroe street, east of Halsted street, and lived in Chicago for 21 years until she was married. She remembered Edward W. Morrison, stated that he was married twice, first to Emily Van Dusen and second to Balbina. She never heard any talk among the members of the Morrison family regarding any child of Edward W. Morrison, and stated that it was common talk in the Morrison family that Edward could have no children. The witness never heard of any person claiming to be the son of Edward W. Morrison, or of any wife of his by the name of Mary Prange, and stated that the matter was never mentioned in her presence in the household of James M. Morrison.

The record contains voluminous testimony by neighbors of the Morrison family, men and women, who lived in the immediate neighborhood and knew Edward W. Morrison and his parents, visited them frequently, who testified as to his two marriages, one to Emily Van Dusen, from whom he was divorced, and his later mar-

riage to Balbina. Mrs. Elizabeth Breitung, who was 72 years old and knew Edward W. Morrison from the time that she was 13 years of age; Arthur J. Kendall, who was in the real estate business and managed part of the Morrison property, and knew Edward W. Morrison quite intimately; John Lussen, 85 years of age, who had a cigar store for about 40 years a block and a half from the Morrison home; Alfred G. Lanio, 74 years of age, who lived on the Morrison property about 20 years and visited the Morrison home hundreds of times; Mr. James Rosenthal, who examined Edward W. Morrison in his suit brought by the Central Trust Company of Illinois to set aside deeds to James R. Ward from Edward W. Morrison; Arista B. Williams, a lawyer, who was connected with certain Morrison litigation; Alfred W. Bays, an attorney at law, who drew a will for Edward W. Morrison; Lydia A. Morrison, wife of Ephraim Morrison; Mrs. Edith May Mitchell, who lived next door to James R. Ward, Morrison's attorney, when Morrison lived there and had many talks with him—all testified that Morrison had stated on many occasions, and sometimes under oath, that he was never the father of a child and that they had never heard of his being the father of a child or that he was married to Mary Prange.

The testimony of three witnesses, Mrs. Clara Bahr, Mrs. Lily Bowen and Mrs. Mary Dickinson, was received in evidence over the objections of the executor, who assigns cross errors to challenge the rulings of the court in admitting the evidence. The declarants whose statements were testified to by these witnesses were deceased members of the Prange family, admittedly related to claimant but not to Edward W. Morrison or any member of the Morrison family, either by blood or marriage, unless the alleged marriage between Edward W. Morrison and Mary Prange actually took place, and it is urged by the executor that, while claimant may

establish his pedigree by these declarations, he cannot by the same declarations establish the relationship of marriage of the declarants to Edward W. Morrison, which alone makes the declarant's statements admissible in evidence, since there is no record of any marriage between Edward W. Morrison and Mary Prange. We regard the point as well taken. It was held in *Jarchow v. Grosse,* 257 Ill. 36, *Blackburn v. Crawford's Lessee,* 3 Wall. 175, and *Champion v. McCarthy,* 228 Ill. 87, that before the declarations can be admitted in evidence, the relationship of declarant to the "family or individual to which he or she claimed to be related" must be established by other facts, and claimant cites no cases to the contrary. Nevertheless, the court admitted and considered the evidence of these witnesses, as specifically appears from a written opinion read by the court before the decree was entered, wherein the court said:

"As to the testimony of Mrs. Bahr, Mrs. Bowen and Mrs. Dickinson to conversations which they heard or had with their respective parents on the subject of the alleged marriage of Mary Pranga to Edward W. Morrison, the court has considered it as competent being of the opinion that even then the evidence fails to prove that Foulkes was a son of Edward W. Morrison."

Upon consideration of the whole record the trial court stated:

"That a fair consideration and appraisal of all the evidence leads quite conclusively to the conclusion that William E. Foulkes has not sufficiently shown he is a son of decedent, Edward W. Morrison."

We have carefully examined the record, which is quite voluminous and consists of almost 3,000 pages, and think the court was fully justified in arriving at that conclusion. Aside from the countervailing evidence offered by the executor to rebut the testimony introduced in support of the heirship of William E. Foulkes, there is the documentary evidence hereinbe-

fore set forth showing that Edward W. Morrison was absent from the United States from April 17, 1857, until long after the date of claimant's birth in 1859. If claimant was born in 1859, Edward W. Morrison could not have been his father, and all through the proceedings, beginning with the affidavit filed by claimant in the probate court and followed by strong supporting evidence, both oral and documentary, claimant's birth date was shown to have been April 17, 1859. Under the circumstances the court could not fairly have reached any other conclusion.

Counsel take the position, however, that claimant always used April 17, 1859, as the date of his birth because he had been told by his foster father that he was born on that date and never learned otherwise, but that he was in fact born in 1857. This contention was made after the executor had introduced the evidence relating to the absence of Edward W. Morrison from the United States between 1857 and December, 1859. To sustain the contention claimant sought in rebuttal to prove by Itha Foulkes, claimant's daughter, that in December, 1929, after the death of Edward W. Morrison, she had a conversation with Martha Foulkes, claimant's stepmother, then a very old lady confined to the Home for Incurables in Chicago who died in 1930 before the hearing of this cause, wherein Martha Foulkes had confided in her that the baptismal record introduced by the executor was false and told her to go to the Immanuel Church in search of a baptismal record made by Anna Prange, wife of William Prange, a brother of Mary Prange Morrison, claimant's mother, and stated that "Anna Prange took the baby, Willie, over there and had him baptized at the instance of James Morrison and she was paid for it." In other words, it was claimant's contention that a three-month old baby was baptized in 1859, through connivance between James Morrison and Anna Prange in lieu of claimant, at a time when he was two years of age, so as to make it appear

that Edward W. Morrison, who was admittedly absent from the country from 1857 to December, 1859, could not have been claimant's father if claimant was born and baptized in 1859. The executor objected to the evidence because Martha Foulkes was not related to Edward W. Morrison and therefore her declarations were inadmissible under the pedigree exceptions to the hearsay rule, which require, among other things, that the declarant be related by blood or marriage to the family with respect to which the declarations are made. (*Jarchow v. Grosse,* 257 Ill. 36, *Blackburn v. Crawford's Lessee,* 3 Wall. 175, and *Champion v. McCarthy,* 228 Ill. 87.) Claimant's counsel then stated that the testimony was not offered for the purpose of proving pedigree but to show the falsity of the baptismal record. We think the court properly excluded the evidence, because if it was not offered or admissible as tending to prove pedigree it was purely hearsay.

October 11, 1932, the trial court read his written opinion adverse to claimant. Three days thereafter plaintiff's counsel, having evidently changed their position respecting the reasons why the proffered testimony of Itha Foulkes was admissible, stated that it was offered as pedigree evidence and asked the court to reconsider its ruling, and in support of the motion presented the affidavit of Itha Foulkes containing substantially the following subject matter:

That she is the daughter of claimant; that she had appeared as a witness before Judge Taylor on the 28th day of June, 1932, and had testified concerning a visit she had made to Martha Foulkes (second wife of Edward D. Foulkes, deceased, in whose home claimant had been raised); that she was asked to state conversation had with said Martha Foulkes, that said testimony was objected to by Mr. Jacobson and by the court sustained; that the following were matters of which she then was about to testify:

That in the afternoon of December 18th, or thereabouts, 1929, in company with one Laura Brown, she visited said Martha Foulkes at the Home for Incurables, located in Chicago, and that when Laura said to Martha Foulkes that Edward W. Morrison had just died, Martha appeared affected and said to affiant, "I want to see you alone"; that in a day or two affiant went back to the Home and saw Martha alone, about December 30, 1929, that Martha was then in bed and affiant was asked by Martha to come close to her, and that when she did so Martha said, "I have a confession to make, that I want you to tell your father, ever since I married Ed Foulkes I have known that your papa's father was Ed Morrison, he was called Capt. Morrison, I was never allowed to tell your father for fear of sending both of us to the penitentiary, Ed, and myself, unless Ed Morrison was dead. Ed Morrison married your father's mother when she was about 19 years old and your papa was born soon afterwards in the Morrison home on Harrison Street west of the river, right here in Chicago; Edward's father, old Jim Morrison, separated them, he drove her out of the home with her baby, your papa; then Edward Morrison took your father's mother over to her brother's house, William Prange, and told her to wait for him to arrange to take her somewhere else, she was there a week or so when a letter came to her, she never told any one what was in the letter but she tore it up and put it in the stove, saying 'never speak to me of my husband again.' Old Jim Morrison sent his son, Edward, to sea and he went away without saying goodbye to his wife and baby, I can't remember the name of the vessel—while he, Edward, was away Old Jim Morrison went to your grandmother's brother, William Prange, and gave him money to keep Edward's son's identity a secret. Jim Morrison wanted to get rid of both Mary and her baby, so he gave William Prange enough money to start him-

160

self up in business and later built a store building. William Prange agreed never to allow Edward Morrison to know where his son was. Old Jim Morrison told William Prange to take your father over and have him christened under any name but Morrison. This was never done by William Prange as he kept putting it off. In June, 1859, a young woman that Aunt Anna (William Prange's wife) had befriended came to stop for a few days. She had a young baby. Anna took the baby over to the Lutheran Church and had it christened as Mary's baby. After your papa's mother died Ed Foulkes married me and told me to guard Willie as I would my life and to tell him Ed Foulkes was his father and that his birthday was April 17, 1859. You can find that baptism in the old Taylor Street Church. Both William Prange and Ed Foulkes received money from old Jim Morrison until the time of Jim Morrison's death.''

That the conversations with Martha were had at different times from December, 1929, up to the latter part of January, 1930. That on January 24, 1930, affiant was directed to go to see Mr. Jacobson, sent by Mr. Velde of the Chicago Title & Trust Company, then executor's attorney, and Mr. Jacobson informed affiant that he knew who the heir was and all that Mr. Starr need do was to present his client. At said time affiant communicated to Mr. Jacobson the whereabouts of Martha Foulkes who was at the Home for Incurables and thereafter said Jacobson sent his secret female agent as disclosed in the record with this Jacobson's letter to the Superintendent, Mr. Mitchell, to extend courtesies to bearer, Mrs. Sharon Lawson, who represented herself to affiant as a patient in the home.

The court refused to consider the proffered evidence as tending to prove pedigree, and claimant now relies upon that ruling as one of the grounds for reversal. It has been generally held that in order to render pedi-

gree evidence admissible as an exception to the rule excluding hearsay testimony, the declarations of the deceased person on questions of pedigree must be made before any controversy has arisen. In *Sugrue v. Crilley,* 329 Ill. 458, the court, regarding a declaration concerning parentage made after death of the person whose heirship was in question, said (pp. 465, 466):

"Declarations made after a controversy concerning the parentage of a child arises lack the guaranty of trustworthiness which is present when the declarant is free from inducement to misrepresent the facts. Under such circumstances they are subject to a strong suspicion that the declarant is making evidence to serve his own ends. While the controversy must be such as to justify the conclusion that the mind of the declarant is not free from bias, it is not necessary that litigation should have actually begun."

In *Rollins v. Wicker,* 154 N. C. 559, it was held that declarations to be admissible under the pedigree rule must be made prior to the beginning of the controversy; otherwise they must be rejected as evidence. The court there said that it is "the commencement of the controversy and not the commencement of the suit which determines whether the declarations should be rejected or not." The reason underlying the rule is well stated by the court, as follows (p. 562):

"The value of this kind of evidence depends upon its being drawn from an unbiased source, and it should emanate from those in a situation favorable to a knowledge of the truth, and, what is a very important consideration, it should refer to a period 'when this fountain of evidence was not rendered turbid by agitation.'"

It clearly appears that the alleged declarations of Martha Foulkes were made after the death of Edward W. Morrison. She knew of his death and it is not unlikely that she also knew what was common newspaper

gossip, namely, that Edward W. Morrison was interested in an estate worth several millions of dollars. She undoubtedly wished to help her foster son, the claimant, and was talking with his daughter who lived with him. It is fair to assume that she made these alleged statements to support any claim then in contemplation by claimant. Immediately upon Morrison's death the question of his heirship became a matter of controversy, and it then seemed quite certain that litigation would arise over the same. The record discloses that within a month after the declarations were made an attorney was retained to represent claimant. We think the foregoing authorities are particularly applicable to the circumstances of this case, and *Welch v. Worsley,* 330 Ill. 172, and *Jarchow v. Grosse,* 257 Ill. 36, are to the same effect.

The testimony of Itha Foulkes concerning the declarations of Martha Foulkes was properly rejected for the further reason that the declarant was not related by blood or marriage either to claimant or to Edward W. Morrison. She was the widow of Edward Foulkes, the husband of Mary Prange, claimant's mother. Since Edward Foulkes was not the father of claimant, Martha was not related by blood or marriage to claimant, and it is of course admitted that she was not related by blood or marriage to Edward W. Morrison. *In re Wendel's Estate,* 262 N. Y. S. 41, decided in 1933, one of the questions involved was the admissibility of declarations of a foster mother of claimant regarding his paternity. Thomas Patrick Morris claimed he was the son of John G. Wendel, a brother of the decedent, and that by reason of such relationship he was the decedent's nephew and her sole next of kin. The court excluded evidence consisting of pedigree declarations made by persons not related to the Wendel family as to the marriage of James G. Wendel and the paternity of the claimant, under the rule laid down in *Aalholm*

*v. People,* 211 N. Y. 406, and other cases cited in the opinion, including *Blackburn v. Crawford's Lessee,* 3 Wall. 175, wherein it was said that the rule as to the admissibility of such declarations is subject to three conditions: (1) The declarant must be dead; (2) they must have been made *ante litem motam, i. e.,* at the time when there was no motive to distort the truth; and (3) the declarant must be related either by blood or affinity to family concerning which he speaks. Under the third limitation the alleged declarations of one Michael Lynch, a former servant in the Wendel family, made to his daughter, were excluded by the surrogate and similar declarations made by other persons not related to the Wendel family were likewise excluded. The legal principle involved is heretofore discussed in connection with the admissibility of the evidence of Mrs. Bahr, Mrs. Bowen and Mrs. Dickens, and the cases there cited are likewise applicable to the question under discussion.

It is also urged that the court erred in admitting the baptismal record of claimant in evidence. Edward Hoelter, pastor of the Immanuel Evangelical Lutheran Church, who testified on behalf of the executor, produced the church record of that congregation, containing baptisms from 1854 to 1868 and all marriages from 1854 to 1869. These records were in the German language, copies of material portions thereof were introduced by the executor and the witness translated so much of the record as was material. It appears from his testimony that baptism No. 834, which appeared on p. 77 of the record, was a ceremony performed with respect to one Ernest, born April 17, 1859, baptized June 30, 1859, whose parents were Jacob Meck and Marie, née Prange, and that the sponsor was William Prange, who was represented by the mother of the child, and that the baptism was performed by J. A. F. W. Muller. It is conceded that ordinarily the

church record of a baptism is admissible in evidence only for the purpose of proving the fact of baptism, its date, the place of baptism and that the person baptized was born prior thereto. Claimant's counsel admitted that the baptismal record was that of claimant, and one of his witnesses, Clara Bahr, testified that her parents told her claimant was baptized in a Lutheran church on Taylor street. Prior to 1888 Rev. Hoelter's church was located at Taylor and Brown (now Sangamon) streets. As heretofore stated, it was not until three days after the court had read its opinion that the affidavit of Itha Foulkes, which for the first time attacked the identity of the person baptized, was submitted to the court. The baptismal record was clearly admissible for the purpose of proving the fact of baptism, its date, the place of baptism and the fact that the party baptized was born before the ceremony took place (*Blackburn v. Crawford's Lessee,* 3 Wall. 175; *Winkelmann v. Winkelmann,* 345 Ill. 566), and there appears to be no contention to the contrary. In the course of a discussion on this subject the trial court stated that he did not attach great importance to the record, evidently because the clear preponderance of the evidence showed that the claimant was born April 17, 1859, and the record would sustain this fact even though the baptismal record was entirely rejected.

Claimant's counsel lays much stress upon photographs introduced in evidence for the purpose of disclosing a resemblance between claimant and Edward W. Morrison. It was held in *In re Wendel's Estate,* 262 N. Y. S. 41, that in paternity cases the rule of evidence in New York prohibits the exhibition of the child to the jury to prove resemblance to the alleged father. *Bilkovic v. Loeb,* 156 App. Div. 719, is cited. In that case evidence of similarity between the child and the supposed father was stated to be "neither accurate

nor reliable." The court said that "if the evidence is to be excluded where both persons are alive and are before the jury or trial justice, an even more rigid rule should be applied to prevent such testimony in cases where one of the parties is dead and the claimant to the inheritance alone is before the court." In *Sheehan Estate,* 139 Pa. 168, the court said (p. 182):

"We all know that striking likenesses often occur between persons who are not of the same blood; so strong that in many instances the one is mistaken for the other."

The Supreme Court of Illinois in *People v. Kingcannon,* 276 Ill. 251, included in its opinion the following quotation from Beck's Medical Jurisprudence, upon the same subject:

". . . 'It has been suggested that the resemblance of a child to the supposed father might aid in deciding doubtful cases. This, however, is a very uncertain source of reliance. We daily observe the most striking differences in physical traits between parent and child, while individuals born in different parts of the globe have been mistaken for each other.' "

During the later years of Morrison's life he was involved in prolonged litigation. In January, 1917, he was adjudged to be a spendthrift in a proceeding tried in the probate and circuit courts of Cook county. An appeal was prosecuted to the Appellate Court (*People v. Morrison,* 214 Ill. App. 645 [Abst.]) which determined the matter and certiorari was denied by the Supreme Court. Morrison became involved in lengthy litigation with one Rieman. That case passed through various courts of review of this State. (*Rieman v. Morrison,* 184 Ill. App. 20; 207 Ill. App. 394; 264 Ill. 279.) As the result of the Rieman controversy bankruptcy proceedings were instituted against Morrison which were contested and went to the United States Circuit Court of Appeals. Morrison's trustee in the

bankruptcy case filed a bill against James R. Ward in the federal court in Chicago to set aside the deed from Morrison to Ward and a decree setting aside the deed was affirmed by the United States Circuit Court of Appeals. After Ward's death Morrison filed a petition in the probate court praying for restoration of his property, and was found by the verdict of a jury to be no longer a spendthrift, and his property was restored to him. Thereupon he conveyed substantially all his property to the Chicago Title & Trust Company by an irrevocable trust agreement, dated October 21, 1921, wherein he made provision for the payment of his debts, the liabilities arising out of various legal proceedings in which he had been engaged, and for the payment to himself of an income during life. Many of these cases and Morrison's difficulties in connection with the litigation were reported in the newspapers. During all this time claimant remained silent and never asserted the claim that he was a son of Edward W. Morrison. Neither did Martha Foulkes come forward to divulge the information which she is claimed to have possessed through all the years. The affidavit presented to the court stating that she was not at liberty to divulge the information during the lifetime of Edward W. Morrison, for fear that both of them would be sent to the penitentiary, contains no plausible reason for withholding this information. Moreover, throughout his entire life, claimant had given April 17, 1859, as the date of his birth, and so stated in his verified affidavit filed in the probate court in December, 1930, which initiated these proceedings. That was more than 10 months after the declarations of Martha Foulkes were alleged to have been made to his daughter, Itha, who lived with him and assisted him in gathering evidence to support his claim. All these circumstances were undoubtedly taken into consideration by the trial court in reaching the conclusion that claimant

was not the son of Edward W. Morrison. The decree of the court and the findings thereof are abundantly supported by the record. ·

During the pendency of these proceedings in the Appellate Court the executor made two motions, one to dismiss and the other to abate the writ of error. Both of these motions will be denied.

Claimant's counsel suggested the death of William E. Foulkes, plaintiff in error, and moved the court that Harriet A. H. Foulkes, as executrix of the last will and testament of her father, be substituted as plaintiff in error in his stead. This motion is allowed.

For the reasons stated herein the decree of the circuit court is affirmed.

*Affirmed.*

Scanlan, P. J., and Sullivan, J., concur.